## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KEITH DARNELL KELLY,

    Plaintiff,

    v.

                                           Civil Action No.:  ELH-20-2531

COMMISSIONER WAYNE HILL,
WARDEN CASEY M. CAMPBELL,
LAWRENCE F. MILLER,
KRISTOFER DAVIS,
LANDER WALLEY,
CURTIS CORNELL,
DUSTIN FIGNAR,
KELLIE BOWARD,
WARDEN FRANK B. BISHOP, JR.,
RICHARD RODERICK,
MEGAN THRASHER,

    Defendants.[1]

## MEMORANDUM OPINION

Keith Darnell Kelly, a Maryland prisoner, filed this civil rights lawsuit pursuant to 42 U.S.C. § 1983.  In a 68-page Complaint, Kelly alleges a multitude of claims, including use of excessive force, denial of medical care, and retaliation.  ELH 1 (Complaint).  He has also included exhibits.  And, Kelly filed a motion to amend as well as an Amended Complaint.  ECF 8.[2]

---

[1] Defendant Dwight Barnhart is named in ECF 1, but was omitted from the docket.  The Clerk shall correct the omission.

[2] ECF 8 is labeled as a motion for leave to file an amended complaint as well as an Amended Complaint.

Ordinarily, "an amended pleading supersedes" the original.  *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021) (citing *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001)).  However, in the Amended Complaint, plaintiff incorporates all allegations raised in his original Complaint.  ECF 8 at 7, ¶¶ 17 and 18.  Where the plaintiff is a self-represented prisoner who has no ability to comply with formal pleading requirements (*e.g.*, redline version of the

Numerous motions are pending.  They include Kelly's motion for leave to amend his Complaint (ECF 8); plaintiff's motion for preliminary injunction (ECF 18); plaintiff's motion for physical and mental examinations (ECF 31); and Kelly's motion for Clerk's entry of default (ECF 33).  Also pending are defendant Kellie Boward's motion to dismiss or for summary judgment (ECF 23), supported by a memorandum (ECF 23-1) (collectively, "Boward Motion") and exhibits; a motion for extension of time to respond to the suit, filed by defendants Warden Frank Bishop, Jr.; Warden Casey Campbell; Warden Curtis Cornell; Kristofer Davis; Dustin Fignar; Commissioner Wayne Hill; Lawrence Miller; Richard Roderick; Megan Thrasher; Lander Walley; and Dwight Barnhart (collectively, "State Defendants") (ECF 32); and State Defendants' motion to dismiss or for summary judgment (ECF 34), supported by a memorandum (ECF 34-1) (collectively, "State Motion") and 20 exhibits.[3]  Kelly opposes both dispositive motions.  ECF 30; ECF 37.  And, he has submitted exhibits with his responses.

Also pending is the motion of the Maryland Division of Correction ("DOC") to strike the DOC as an "Interested Party."  ECF 21.  The DOC's motion shall be granted, and the Clerk shall be directed to remove "Interested Party" from the docket.

No hearing is necessary to address the pending motions.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons stated below, I shall grant the Boward Motion; the State Motion shall be granted in part and denied in part; and I shall grant Kelly's motion for leave to amend.  But, I

---

complaint), the Court will construe plaintiff's Complaint to include the content of both the original Complaint and the Amended Complaint.

[3] Counsel for the State defendants did not include an index for the 20 exhibits attached to their motion.  Counsel is reminded that the local rules for this court state: "If any motion, memorandum, or brief is accompanied by more than five exhibits, the exhibits shall be tabbed and indexed."  Local Rule 105.5 (D. Md. 2018).

shall deny Kelly's motions for preliminary injunction, for physical and mental examinations, and for Clerk's entry of default.

## I.  Factual Background

### A.    Kelly's Allegations

On May 28, 2019, Kelly was an inmate at Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland, assigned to disciplinary segregation.  ECF 1 at 5-6, ¶ 18.  He is now confined at North Branch Correctional Institution ("NBCI").  *Id.* ¶ 3.

Plaintiff claims that on that date, defendant Walley came to his cell to escort him to a case management review hearing.  *Id.*  Kelly recalls that Walley opened the tray slot on the cell door, handcuffed Kelly behind his back, called for the cell door to be opened, and searched Kelly after he exited the cell.  *Id*. at 6, ¶¶ 19, 20.

According to Kelly, during the escort to the review hearing, Walley engaged in what Kelly describes as a "very unprofessional, threaten[ing] and dangerous conversation" in which Walley called plaintiff a "rat (snitch)" and a "scared bitch."  ECF 1 at 6, ¶ 21.  Kelly alleges that Walley "talked about how he would fuck up" Kelly's "bitch ass brother" because he called the prison on Kelly's behalf.  *Id*.  Further, Kelly alleges that Walley threatened to set Kelly up because Kelly had written complaints about Walley and other officers.  *Id*.

Kelly acknowledges that he used profanity when addressing Walley and that he told Walley he was going to complain about Walley's threats.  *Id*.  Kelly recalls that Walley told him he did not care and again threatened Kelly's brother with assault.  ECF 1 at 7, ¶ 21.  Upon arriving to the area where the segregation reviews were taking place, Walley told Kelly "to have a seat" and he also said:  "'Don't move you little bitch.'"  *Id.* ¶ 24.

After Kelly was seated, defendants Davis, Cornell, Fignar, and an officer named either Powers or Powell arrived, escorting other inmates for segregation reviews.  ECF 1 at 7-8, ¶ 25. Kelly recalls Cornell asking Walley what was going on and speculates that Cornell must have heard Walley telling plaintiff not to move.  *Id*. at 8, ¶ 26.  Kelly alleges that Walley told Cornell nothing was going on.  *Id*.  After Fignar and Davis seated the inmates they were escorting, Kelly claims they began a verbal assault against him.  *Id*. ¶ 27.  Kelly states that Fignar said he could not wait "'until those gangs get a hold of your coward ass'" and that Kelly was "'all mouth.'" *Id*. ¶ 28.  Kelly claims that Cornell also said all Kelly does "'is run his big mouth'" and accused him of being too scared to have a cellmate.  *Id*. ¶ 29.

According to Kelly, Walley then joined in and repeated that Kelly was a "rat and a coward" and made vulgar remarks about what he would make Kelly and his brother do.  *Id*. at 9, ¶ 30.  Kelly admits that he also engaged in the verbal exchange and made vulgar, threatening statements about Walley's children and his wife.  *Id*. ¶ 31.  Kelly recalls Walley said that Kelly "'better watch his back at all times'" because "'cell doors do malfunction,'" especially the doors on cells housing members of the gang known as the Bloods.  *Id*. ¶ 33.  Kelly explains that the Bloods have threatened his life and claims those threats are the reason he was on disciplinary segregation.  *Id*. ¶ 34.

Kelly was escorted into the review room by Davis, who remained in the room during the hearing.  ECF 1 at 12, ¶ 39.  Kelly recalls that the review team consisted of a Case Management Staff Member, Dwight Barnhart; Chelsea Finucane; an "Intel" officer; and another Case Management staff member who was conducting the hearing.  *Id*.  During the hearing, Kelly asked why he had not been transferred to another prison yet and advised the review team that he was still being threatened by other inmates and officers.  *Id*.  Kelly claims he also told the review

team about the verbal exchange that had just taken place prior to his entry into the hearing. *Id*. at 12-13, ¶ 39. In answer to plaintiff's questions, Barnhart advised that Kelly could not be transferred because he was viewed as a "serious disciplinary problem and officers daily viewed [his] 'daily behavior' as poor." *Id*. at 13, ¶ 39. Kelly asserts that Barnhart's statements were untrue. *Id*.

Kelly also complained to the review team about officers not sending out his mail and claimed the officers threw away his mail or gave it to gang members. ECF ¶ 40. Kelly specifically alleges that Fignar, Walley, Davis, and Officer Quackenbush are "guilty of mail fraud and tampering." *Id*. Kelly also asked the review team why he was still charged with assaulting inmate Dominic Frazier when an investigator had concluded that Kelly was simply protecting himself from Frazier, a known member of the Bloods. *Id*. at 13-14, ¶ 41. Kelly noted that Fignar had dropped the rule violation for assault that was brought against Frazier and had helped Frazier get released to home detention. *Id*. at 14, ¶ 41.

Kelly recalls that he provided the review team with dates and times of incidents to support his claims. They include the following, ECF 1 at 14-16, ¶ 42[4]:

> Kelly claims that in August 2018 he was attacked by members of BGF, *i.e.*, a gang known as the Black Guerilla Family, and that they had advised him they were hired by Officers Reel and Fignar to assault him so he would close his "big mouth." ECF 1 at 15, ¶ 42.
>
> On March 25, 2019 at 10:56 a.m., Kelly gave a mental health nurse a request form stating he was in danger from both officers and inmates.
>
> On March 29, 2019 at 10:00 a.m., Officer Reel came to Kelly's cell door laughing about the false infraction he had issued against Kelly and stating: "'I can't wait to get my BGF . . . on that ass again.'"
>
> On April 4, 2019, Kelly wrote to Warden Campbell regarding gang members and Officers Fignar and Davis.

---

[4] I have used block form for convenience, but the list is not a quote from the suit.

On April 5, 2019 at 10:10 p.m., Kelly spoke to an investigator about the complaints he had filed regarding "dirty officers."   Kelly's offer to take a polygraph test was declined by the investigator.

On April 8, 2019, Davis and Fignar called Kelly a rat and told a BGF member working on the tier that Kelly had filed a complaint about BGF members playing with Kelly's food.

On April 20, 2019 at 11:25 p.m., Officer McVey came to Kelly's cell door and warned out loud that Kelly should be careful about writing everyone up.

On April 23, 2019 at 7:10 a.m., Fignar called Kelly a "'rat'" and a "'coward'" and told other inmates that Kelly was "'scared to come off of lock-up.'" Fignar then threatened that officers would assault Kelly again like they had the year before.

On May 11, 2019 at 7:12 p.m., an officer threw Kelly's administrative remedy procedure requests ("ARPs") in the trash.

On May 21, 2019 at 4:25 p.m., Kelly gave Officer Moore a written complaint to be placed in the in-house mail to the Warden.

On May 22, 2019 at 10:22 a.m., Cornell came to Kelly's cell and said, "'You still alive.'"

On May 26, 2019 at 11:40 p.m., Officer McVey called Kelly a "scared bitch" and said he couldn't wait for Kelly to get payback for writing officers up.

Kelly states that Davis interrupted Kelly's presentation and asked if the review team was done with Kelly.  *Id*. at 16-17, ¶ 43.  When Davis was advised that the team had "been finished," Davis began to escort Kelly from the room.  *Id*. at 17, ¶ 43.  Kelly claims the review team's dismissal of the events he was recounting amounted to deliberate indifference to his need for protective custody.[5]  *Id*.  Kelly particularly faults Hill, Warden Campbell, and Barnhart for ignoring the credible information regarding the threats Kelly had received, and claims they also

---

[5] RCI does not have protective custody housing.  ECF 34-11 (Decl. of Warden Casey Campbell), ¶ 8.

ignored repeated recommendations of RCI's own Investigative Division, which stated that Kelly should be transferred. *Id.,* at 17-18, ¶ 43.[6]

Prior to leaving the segregation review hearing, Kelly asked if he could get a phone call, but claims Davis denied his request because Kelly had a sign on the window of his cell door. ECF 1 at 18-19, ¶ 44.  Kelly states that it was merely a small piece of paper, *id.* at 19, and Walley had already made him remove the paper.  Plaintiff argued that because his cell was brought into compliance, he should get the phone call.  *Id.*  Kelly recalls Barnhart observed that if Kelly would stop being a daily behavior problem, he could get a phone call.  *Id.*  Kelly then asked for an ARP form.  *Id.*  As Davis took Kelly by the arm to escort him out of the hearing, Kelly admits that he looked at Barnhart and, as plaintiff left the room, plaintiff said: "'All of you can suck my dick.'"  *Id.* at 20, ¶ 45.

According to Kelly, when he and Davis exited the hearing, Davis used a racial slur.  ECF 1 at 20, ¶ 46.  Davis also told Walley, Fignar, and Cornell what had occurred in the hearing and advised that Kelly was keeping a log of his interactions with officers and what officers were doing.  *Id.* at 21, ¶ 48.  Kelly asserts that it became clear to him that the officers were interested in obtaining his "Data Log," where he documented daily activities, but claims that because he had sent a copy of the log to his brother he was not worried about the officers finding it.  *Id.* at 22, ¶ 49.  Kelly claims that as he was being escorted back to his cell by Cornell and Davis, Cornell demanded to know where Kelly was "'hiding those snitch papers at.'"  *Id.*  When they arrived at Kelly's cell, Davis and Cornell entered Kelly's cell to search it and began tossing his

---

[6] There is no dispute that Kelly was on a transfer list for a medium security prison at the time of the incident.  Defendants note, however, that Kelly was not immediately transferred because there was a lack of bed space in medium security prisons.  *See* ECF 34-11 (Campbell Decl.), ¶¶ 5, 6.

belongings all over the cell. *Id*. at 24-25. In his view, this conduct was not related to "institutional security." *Id.* at 25; *see id.* at 23-24, ¶ 50.

Kelly claims that during the search of his cell, he was permitted to go inside the cell and stand by the toilet, trying to keep a distance from Davis and Cornell while they searched. ECF 1 at 25, ¶ 51. Kelly claims that Walley and Fignar asked where the "rat papers" were and states that Walley, Fignar, and Officer Powell or Powers stood in the doorway of the cell to block the view of other inmates on the tier. *Id*. at 26. Kelly claims that when Davis and Cornell could not find the log and were not successful in upsetting Kelly, Cornell falsely claimed he saw Kelly kick Davis. *Id*. at 26-7. Davis then punched Kelly in the face and mouth, smashed Kelly's face into the cell wall, and broke off Kelly's two front teeth, which became lodged in Kelly's lower lip. *Id*. at 27, ¶ 53. Further, he claims that Davis put him into a "choke hold" and took him to the floor as Davis continued to punch Kelly with a closed fist on top of Kelly's head, reopening an old wound on the side of Kelly's head. *Id*. Kelly thought the officers were going to murder him. *Id.*

According to Kelly, he fought to remain conscious while Davis's arm was around his neck, and he remained handcuffed behind his back during the assault. ECF 1 at 28, ¶ 54. Kelly asserts that he was having difficulty breathing during the assault, but managed to scream when he maneuvered his lower body out of the "awkward" and painful position it was in. *Id*. at 28, ¶ 55. After Kelly screamed, he claims Walley told Davis to stop and came into the cell to pull Davis off of Kelly. *Id*. at 29, ¶ 55. In response, Davis stood up and began kicking Kelly in the ribs, back, and thigh as Kelly tried to "ball-up and use the toilet for protection." *Id*. Kelly continued to scream in order to alert other inmates on the tier as to what was happening, and

claims that Davis stomped on his legs and kicked him a few more times in response to his screams before stopping the assault.  *Id.*

According to Kelly, he began making statements loud enough for other inmates to hear that Davis had chipped Kelly's teeth and that Kelly was still handcuffed behind his back.  ECF 1 at 29, ¶ 56.  Kelly claims that Davis began telling the other officers present that they should say that Kelly had head-butted Davis.  *Id.* at 30.  Kelly recalls Davis smacking his own forehead with the palm of his hand to bolster the false report.  *Id.*  Moreover, he claims the officers tried to avoid any surveillance cameras.  *Id.*

Kelly alleges that Cornell helped him to his feet and used boxes that had been tossed around in the cell to wipe Kelly's bleeding mouth and told Kelly to put on his tennis shoes.  ECF 1 at 30, ¶ 57.  As Kelly put his shoes on, Fignar noticed that Kelly had urinated on himself.  *Id.* Cornell then used a wet t-shirt to wipe Kelly's face again because his wounds continued to bleed. *Id.*  According to Kelly, a conversation ensued wherein the officers present offered to "call it even" and that Kelly should simply claim that he had a seizure, but Davis kept telling the officers to say that Kelly had head-butted him.  *Id.* at 31, ¶ 58.  Kelly told Davis to stop lying and pointed out that it would be foolish of him to attack an officer while he was handcuffed behind his back. *Id.*  Kelly claims that Davis continued to ask the other officers to support the false story that Kelly attacked him.  *Id.* at 32.

Although Kelly is not certain when Powers (or Powell) left his cell, he claims the officer was present during the beating and encouraged it.  *Id.* at 31, ¶ 57.  And, the officer allegedly acted as "a human shield" to block visibility into the cell.  *Id.*  Moreover, he claims that Davis and Cornell destroyed most of his legal papers and clothes.  *Id.*

As Kelly was being escorted off the tier, past the Lieutenant's office where segregation reviews were being held, Kelly kicked the door and screamed for the Lieutenant to come out to see his injuries.  ECF 1 at 32, ¶ 59.  Kelly explains he wanted to ensure everyone in the office could see that he had been beaten and that there were no marks on Davis.  *Id*.  Kelly recalls an officer emerging from the control station to ask what was going on and why Kelly was limping.  *Id*. at 33, ¶ 60.  Davis and Walley answered that Kelly had punched Davis and had to be restrained, while Cornell stated that Kelly had kicked Davis.  *Id*.  Kelly hypothesizes that because Cornell contradicted the cover-up story that Davis had devised, Cornell's report of the incident was "altered to exclude [Cornell] from being present inside of Kelly's cell" during the assault.  *Id*. at 34.

In Kelly's view, Cornell's report, which admits that Cornell was with Fignar, Kelly was already in handcuffs, and Cornell and Fignar took control of Kelly to escort him to medical, lends credence to Kelly's claim that the report is false.  *Id*.  Further, Kelly contends that Cornell's report is at odds with Davis's report, which states that Cornell and Fignar came into Kelly's cell to escort him to medical, because Cornell reported that Walley and Davis entered the cell and Kelly ran into the cell "moments later."  *Id*.  Kelly also disputes Cornell's assertion that Kelly jerked away from the officers during the escort to medical in order to kick the Lieutenant's door.  *Id*. at 35.

After Kelly kicked the door, an officer came out of the office and Kelly began yelling that he had been assaulted.  ECF 1 at 35, ¶ 61.  Kelly claims that Fignar grabbed the handcuffs on Kelly's wrists and pushed his arms in the air toward his head while Cornell kicked Kelly's feet out from underneath him, causing him to fall to the floor.  *Id*. at 35-36.  Kelly cried out to Ms. Finucane, who was still inside the office conducting reviews, but she simply looked away.

*Id*. at 36.  Cornell and Fignar then grabbed Kelly's forearms near his wrists and pulled him to his feet and began to drag Kelly to a transport van to take him to medical.  *Id*. at 36, ¶ 62.

Plaintiff states that, after they arrived outside, Fignar had to return inside to retrieve the keys to the van, leaving Kelly alone with Cornell.  *Id*. at 37.  As they waited for Fignar to return, Kelly claims that his arms were again "violently snatched up behind his back sending severe pain throughout his body."  *Id*.  According to Kelly, it was the Intel Officer who had attended the segregation review hearing who had grabbed his arms.  *Id*.  After Kelly screamed, Cornell "waved off" the officer, who reluctantly let go.  *Id*.  Kelly alleges that the Intel Officer repeatedly asked Cornell whether they needed his help to transport Kelly, in case he "gets out of line again."  *Id*.  Cornell allegedly answered, "'No we got it.  He's (plaintiff) done had enough, he's (plaintiff) going to be a good little boy now.  Isn't that right boy. . . .'"  *Id*.  And, "like a good slave," plaintiff "did not dare spit out any blood from his bleeding mouth . . . ."  *Id.*

Fignar returned and gave the keys to the van to Cornell, who opened the side door and helped Kelly into the van.  ECF 1 at 38, ¶ 63.  Kelly claims that Cornell did not fasten Kelly's seatbelt or take any other safety precautions to ensure that Kelly would not be injured during the ride to medical.  *Id*.  Kelly describes the 30 to 40 seconds it took to get to the medical building as a "ride from hell."  *Id*.  According to Kelly, Fignar began telling him that he would be killed by gang members once he was transferred to NBCI; that Fignar wished he could witness Kelly getting stabbed; and that Kelly was going to get a "street charge" for assaulting Davis, adding that "no n***er is going to be found not guilty in our county."  *Id*. at 38-39, ¶ 63.

Once the van reached the medical unit, Fignar exited the van and Cornell took Kelly out of the van to escort him inside.  ECF 1 at 40, ¶ 65.  Kelly states he could no longer swallow the

blood in his mouth and spit it out on the pavement.  *Id*.  Fignar opened the door to the building and Cornell escorted Kelly inside.  *Id*.

Kelly was seen by Nurse Kellie Boward.  ECF 1 at 40, ¶ 66.  Kelly reported that he had been beaten by Davis, that his teeth had broken off, and that he feared he had sustained internal injuries from the beating by Davis and the force used against him by Fignar and Cornell.  *Id*. Kelly claims that Boward "sadistically refused to examine him," despite seeing his bleeding mouth, the cut over his right eye, his leg was swollen, and he was limping.  *Id*.  According to Kelly, Boward simply "crossed her arms over her chest" and announced that Kelly was "'fine.'" *Id*.  Kelly also claims that Boward told Cornell and Fignar not to allow Kelly to see a dentist because it "'would prove he had injuries'"; asked if Davis was okay; and remarked to Kelly:  "I bet you won't get away with hitting a staff member this time.'"  *Id*. at 41, ¶ 67.

To explain that last assertion, Kelly recounts that in December 2018, he had a seizure and unintentionally struck Boward and another nurse.  ECF 1 at 41, ¶ 68.  He states that despite the circumstances, Boward had insisted that Kelly be charged with assaulting staff.  *Id*. at 42. However, after an investigation into the incident, Kelly was not charged.  *Id.*  Kelly surmises that Boward held a grudge against him because of the incident.  *Id*. at 43.

Boward's report of the incident of May 28, 2019, acknowledges only that Kelly had a chip to his right front tooth and a small red mark inside his lower lip.  *Id*. at 43, ¶ 69.

Following plaintiff's examination by Boward, he was photographed by Officer Stegner-Youtzy.  ECF 1 at 44, ¶ 70.  Kelly maintains that Stegner-Youtzy refused to take photographs of Kelly in a manner that would show all of his injuries and that the angle of the facial photograph obscured the injury to his eye.  *Id*.; *see also id.* at 48, ¶ 72.  In addition, Kelly claims that he told Stegner-Youtzy and Officer Boozel that Davis had assaulted him and asked if his cell would be

photographed.  ECF 1 at 48, ¶ 72.  Although the officers assured Kelly that his cell would be photographed, he claims that no photographs were ever taken.  *Id.*  Moreover, Warden Campbell allegedly denied Kelly's public defender access to the cell, even though the lawyer was representing Kelly at the criminal trial on February 24, 2020.  *Id.*

Kelly was placed in an isolated "observation cell" he claims is used for mental health observation and for inmates who are being transported to lock-up or protective custody.  *Id.* at 45, ¶ 71.  He claims that he remained in this cell for eight days, and asserts that the cell was unsanitary, the plumbing was defective, and the cell was smeared with feces.  *Id.* at 45-47.  Further, he claims that he was not provided with a shower, a mattress, eating utensils or toilet paper.  *Id.* at 46.  According to Kelly, he had to use pieces of his jumpsuit for toilet paper; had to eat with his hands, which he could not wash because there was no soap; and the water in the toilet and from the sink was very hot.  *Id.* at 46-47.

Moreover, as a result of his injuries, Kelly claims that he could not "'truly eat'" due to severe soreness in his gums as well as loose teeth.  *Id.*  He began to lose weight.  *Id.* at 47.  Kelly adds that when nurses brought his seizure medicine to the cell, they would not talk to him but one nurse disclosed that they were told not to treat his wounds or give him anything for pain.  *Id.*

In Kelly's view, he was assigned to this cell because defendants were attempting to keep him from being seen by staff members who did not want to engage in the cover-up plot.  ECF 1 at 46, ¶ 71.  He states he was not permitted to go to his adjustment hearing for the infraction he received in connection with the events of May 28, 2019, and claims this was because his right eye was swollen and "pus ridden."  *Id.*  He also claims that, upon the request of Fignar, Captain Miller filed a false report in an effort to keep Kelly away from the hearing.  *Id.*

Kelly states that the mental health nurse, Finucane, "wanted nothing to do with Plaintiff and his situation."  ECF 1 at 47, ¶ 71.  But, she came to the isolation cell at the request of Warden Campbell "to declare" plaintiff as "delusional and crazy."  *Id.* at 48.  He claims Finucane lied to help Fignar, *id.*, and told plaintiff that "what was going on with [him] was above her pay grade."  *Id.* at 47.  Kelly claims that Finucane later repeated everything he told her and helped Fignar "railroad[]" him on a false disciplinary charge.  *Id.* at 48.[7]  According to Kelly, a mental health pre-adjustment hearing assessment was read into the record, but Kelly never received a copy of it, nor was he told what was read into the record.  *Id.*

Kelly maintains that he was not "a security threat," as Miller had reported.  ECF 1 at 49, ¶ 73.  Rather, defendants wanted to keep him "out of sight until his injuries healed."  *Id.*; *see also* ECF 1-1 at 30 (May 31, 2019 Miller Memo).  Kelly states that no investigator came to see him until after his swollen eye had healed and then on that day, June 5, 2019, he was transferred to NBCI.  ECF 1 at 49, ¶ 73.  When Kelly arrived at NBCI, he was placed on staff alert status but was removed from that status one and a half days later because he claims Lt. Walter Iser could not understand why he was kept at RCI for eight days after an alleged assault on a staff member.  *Id.*  Kelly claims that the usual practice when an inmate assaults a staff member is to transfer the inmate immediately to NBCI, which can sometimes take one or two days, but never eight days.  *Id.* at 50.

After Kelly arrived at NBCI, he received some dental care, but it only involved filing off the sharp edges on his teeth.  ECF 1 at 50, ¶ 73.  He claims the assault by Davis is the reason that he will soon have to have all of his teeth removed.  *Id.*

---

[7] It is unclear what disciplinary charge Kelly is referring to in connection with Fignar.

Further, Kelly claims that he continues to suffer physical, emotional, and mental health problems as a result of the assault and because he was falsely accused of assaulting Davis. ECF 1 at 51, ¶ 74. Kelly continues to suffer bleeding gums, toothaches, and headaches, and claims that he continues to pass blood with bowel movements and urination. *Id*. In addition, he claims that his right eye "tears" and occasionally excretes pus. *Id*. According to Kelly, he has not been given anything for pain and has been told by medical staff to buy his own medication for pain from the commissary. *Id*. A sick call nurse at NBCI told Kelly that the blood in his urine and with his bowel movements is simply a side effect of his seizure medication (Keppra and Dilantin[8]), but Kelly does not believe this is true. *Id*.

Although Kelly was found guilty of assaulting Davis during an adjustment hearing, he was acquitted of criminal charges for the assault following a trial by jury in the Circuit Court for Washington County on February 24, 2020, Case C-21-cr-19-000788. ECF 1 at 54, ¶ 76; and *id*. at 60, ¶ 83, *see also* ECF 1-1 at 37-41 (application for statement of charges against Kelly). Kelly recalls that during the criminal trial, none of the officers could remember what they wrote in their reports and statements. ECF 1 at 52, ¶ 75. In addition, he claims that Davis, Walley, Fignar, Boward, and Stegner-Youtzy presented contradictory testimony. *Id*. at 51-52, ¶ 75. Further, plaintiff asserts that none of the inmates who were on the tier during the assault were interviewed as part of the investigation, no investigator viewed the security video surveillance, and no photographs were taken of his cell. *Id*. at 53, ¶ 75.

As a result of the guilty finding at the institutional level, Kelly lost 250 days of good conduct credit, was sentenced to 430 days of disciplinary segregation, and was transferred to NBCI. *Id*. at 2-3, ¶ 3. Kelly claims he informed staff at NBCI that there is a hit out on him. *Id*.

---

[8] The side effects for Dilantin include blood in the urine or stools. *See* www.drugs.com/sfx/dilantin-side-effects.html (last viewed May 24, 2021).

at 3, ¶ 3.  Kelly continues to refuse housing assignments leading to his continued assignment to disciplinary segregation for doing so.  *Id*. at 3, ¶ 4.

As relief, Kelly seeks a declaratory judgment stating that his constitutional rights were violated (ECF 1 at 66, ¶ 99); an injunction requiring Hill, Bishop, Roderick, and Thrasher to cease physical and psychological threats that Kelly will be put into general population where he will be killed, seriously hurt, or will be forced to defend himself (*id*. at 66, ¶ 100); compensatory damages of 2.2 million dollars against each defendant (*id*. at 67, ¶ 101); and punitive damages of 2.2 million dollars.  *Id*. at 67, ¶ 102.

In the Amended Complaint, Kelly seeks to add the following additional defendants: David Sipes, Ronald Stottler, Audrey Brown, and Robin Woolford.  ECF 8 at 5, ¶ 9.  He also adds a claim that he was denied due process in connection with the adjustment hearing that he was not allowed to attend, supposedly because he was a danger to the security of the institution. *Id*. at 2, ¶ 2.

## B.    Defendants' Response

Walley avers that when he arrived at Kelly's cell prior to the segregation review hearing, he noticed that Kelly's cell was "not in compliance" but did not take steps to correct it at that time because they needed to get Kelly to his review hearing.  ECF 34-10 (Walley, Decl.), ¶ 4. Walley explains that Kelly was "not dressed appropriately" when they got there to take him to his review hearing and that he had to ask him to "adjust his jumpsuit appropriately."  *Id*.

Kelly's statement, provided in the context of the Use of Force reports, explains that he had a disagreement with Walley when Walley came to Kelley's cell to escort him to his segregation review hearing about whether he was required to put his jumpsuit completely on.

ECF 34-13 (Use of Force Report, 5/30/19) at 17.[9]  Kelly complied with Walley's order but continued to talk about how "dumb" it was to make him put on his jumpsuit when it was so hot. *Id*.  Kelly then recalled that Walley told him to stop whining and commented he would have to watch himself before Kelly called his "'brother and have him screaming on me.'"  *Id*.  It was this verbal argument that Kelly claims Davis, Cornell, and Fignar weighed-in on when he and Walley reached the area where segregation reviews were taking place. *Id*. at 17-19.

Walley recalls that Kelly became visibly agitated during his segregation review because he was denied a telephone call slip, but he does not recall who denied it.  ECF 34-10, ¶ 3.  According to Walley and Davis, after the review hearing, they had to bring Kelly's cell into compliance before they could allow Kelly to return to his cell.  ECF 34-3 (Davis Decl.), ¶ 4; ECF 34-10, ¶ 4.  Both officers claim that Kelly had a sheet hanging from the ceiling, which they describe as a safety issue for both inmates and correctional officers.  ECF 34-3, ¶ 4; ECF 34-10, ¶ 4.  While Walley and Davis went into the cell, they told Kelly to remain outside of the cell. Instead, Kelly ran into the cell and assaulted Davis.  *Id*.

Davis claims Kelly first tried to kick him but missed.  ECF 34-3, ¶5.  He then "head-butted" Davis, striking him on the side of his face.  *Id.*  Walley witnessed Kelly's conduct toward Davis.  ECF 34-10, ¶ 5.  Walley assisted Davis, who took Kelly to the ground.  *Id*. ¶ 6.

Fignar arrived at the cell during the incident and saw plaintiff hit Davis.  ECF 34-3, ¶ 6; ECF 34-4 (Fignar Decl.), ¶ 5; *see also* ECF 34-5 (Cornell Decl.), ¶ 5.  Fignar and Cornell state that as they were returning other inmates to their cells after a segregation review, they heard a commotion coming from Kelly's cell and reported to the area to assist.  ECF 34-4, ¶ 4; ECF 34-5, ¶ 4.  Fignar asserts that as he walked toward the area where Kelly's cell was located, he saw

---

[9] ECF 34-13 at 17 is "Offender's/Detainee's Statement."

Kelly, who was handcuffed, standing outside of his cell while Walley and Davis were inside. ECF 34-4, ¶ 5.  Fignar recalls that "almost immediately [he] witnessed [Kelly] enter the cell" and, when Fignar got to the cell, he saw Kelly try to kick Davis and miss.  *Id*.  He then witnessed Kelly hit Davis, using his head.  *Id*.  At that time, Fignar saw Davis and Walley take Kelly to the ground to regain control over him, and he maintains that this was the only physical contact he witnessed between Kelly, Davis, and Walley.  *Id*.  Cornell recalls that Kelly was already on the ground when he arrived.  ECF 34-5, ¶5.

Fignar and Cornell subsequently escorted plaintiff to the medical unit for evaluation. ECF 34-3, ¶ 6; ECF 34-4, ¶ 5.  Fignar maintains that he and Cornell did not go into the cell until Davis and Walley had "secured the situation."   ECF 34-4, ¶ 6.   According to the State Defendants, it is "standard procedure" for officers who are not involved in a use of force against an inmate to escort the inmate to medical after the incident.  ECF 34-3 (Davis Decl.), ¶ 6.

Fignar explains that segregation inmates are taken to the lobby to await a transport van when they are taken to medical.  ECF 34-4, ¶ 7.  This ensures they are kept separate from general population inmates.  *Id*.  Fignar and Cornell escorted Kelly through the lobby.  Both officers claim that Kelly "jerked" out of their "grasp and kicked the door of a lieutenant's office while the lieutenant was conducting seg reviews."  ECF 34-4, ¶ 8; *see also* ECF 34-5, ¶ 6.  Cornell offers that it was necessary to take Kelly down to the ground "to prevent him from also kicking out a window."  ECF 34-5, ¶ 6.  Cornell and Fignar took Kelly to the ground, claiming that Kelly remained "fairly combative" for several minutes but he eventually calmed down.  ECF 34-4, ¶8; ECF 34-5, ¶ 6.  After they regained control of Kelly, they were able to escort him to the transport van without further incident.  ECF 34-4, ¶ 8; ECF 34-5, ¶ 6.  Fignar states that taking Kelly to

the ground during the escort is considered a use of force, requiring the officers involved to write a report.  ECF 34-4, ¶ 12, *see also* ECF 34-5, ¶ 10.

Neither Fignar nor Cornell recalls who forgot the keys to the van, but they state that it is not unusual to have to retrieve the keys because a lot of officers use the van and the keys have to be located from the most recent driver.  ECF 34-4, ¶ 9; ECF 34-5, ¶ 7.  Fignar recalls that when they reached medical, he noticed that Kelly had a very small cut on his lip.  ECF 34-4, ¶ 10.  Fignar did not see any other injuries, nor did he hear Kelly complain about other injuries.  *Id*.  Cornell saw no injuries to Kelly, nor did he hear him complain of any injuries during his evaluation by Boward.  ECF 34-5, ¶ 8.

Walley and Davis deny conducting a cell search when they entered Kelly's cell.  They state that they only went inside the cell to bring the cell into compliance.  ECF 34-3, ¶ 7; ECF 34-10, ¶ 7.  They also deny knowledge of a log Kelly was keeping or any legal papers inside his cell.  ECF 34-3, ¶ 8; ECF 34-10, ¶ 8.  In addition, Walley and Davis deny using racial slurs, making threats, calling Kelly a rat, or hearing anyone else do so.  *Id*. ¶ 9.  And, they deny assaulting Kelly or seeing anyone else assault him.  *Id*. ¶ 10.

The "Use of Force and Serious Incident Report" prepared in the aftermath of the force used by Walley and Davis against Kelly describes Walley and Davis entering Kelly's cell together to remove a sheet hanging from the ceiling, leaving Kelly alone on the tier.  ECF 34-13 at 3.  The written statements provided by Walley, Davis, Cornell, and Fignar in connection with this Report reflect that Walley and Davis entered Kelly's cell together to remove the sheet.  *Id*. at 6, 8 10, 12.

A document entitled "Weekly Institutional Summary" for the week ending May 31, 2019, varies from the account provided by Walley and Davis.  ECF 34-21 at 4.  It indicates that Davis

went into Kelly's cell alone to pull a sheet down from the ceiling that was blocking the view into the cell.  *Id.*  Further, it indicates that Kelly "broke free from Sgt. Walley's escort grip and entered the cell and tried to kick Davis with his right foot but missed."  *Id.*  "Kelly then forced his head toward Davis's forehead and made contact with the right side of his face, just above his right eyebrow."  *Id.*  There is no author noted on the summary, however.  But, Walley and Davis recalled that they both went into Kelly's cell to pull the sheet down from the ceiling, leaving Kelly alone on the tier.  ECF 34-3 (Davis Decl.), ¶¶ 4, 5; ECF 34-10 (Walley Decl.), ¶ 5.

In the Use of Force and Serious Incident Report prepared in connection with the incident involving Cornell and Fignar during their escort of Kelly, Duty Officer J. Brengle concluded that the force used by the officers "was necessary and appropriate to gain control of inmate Kelly" and that the force used was "appropriate and consistent with policy and procedure in Use of Force Manual."  ECF 34-14 at 3; *see also id.* at 6 (Miller and Campbell stating force was needed).

Neither Fignar nor Cornell remember being present when photographs were taken of Kelly after his medical examination, but both deny ever interfering in the process or instructing a photographer not to take pictures of an inmate's injuries.  ECF 34-4, ¶ 11; ECF 34-5, ¶ 11.  Both officers deny using racial slurs and assaulting Kelly and deny seeing or hearing anyone else engage in such conduct.  ECF 34-4, ¶¶ 13, 14; ECF 34-5, ¶ 12.

With regard to Kelly's alleged injuries, Kellie Boward, RN, states that his complaints regarding his teeth pre-date the alleged assault by Davis.  ECF 23-2 (Boward Decl.) ¶ 6.  On January 8, 2019, Kelly submitted a sick call slip stating his "whole mouth hurt" because he was hit in the mouth with a stick and his front tooth was chipped.  *Id.*; *see also* ECF 23-3 (medical

record) at 50.  Kelly also claimed that he needed a filling that had not been rescheduled and that his gums bleed heavily when he brushs his teeth.  ECF 23-2, ¶ 6.

The State Defendants submitted a "Use of Force and Serious Incident Report" for an incident that occurred on January 2, 2019.  ECF 34-7.  Defendants rely on this incident to support their claim that any injury to Kelly's mouth and teeth occurred before the incident of May 28, 2019.

The report, authored by Todd K. Faith, Chief of Security at RCI, indicates that Officer Bolland observed Kelly "walking up the B tier stairs while pulling a broken mop handle from under his sweater."  ECF 34-7 at 3.  Kelly used the mop handle to assault another inmate.  *Id.* Although Kelly and the other inmate were ordered to stop fighting, Kelly "kept swinging the mop handle at inmate Frazier."  *Id.*  Bolland "sprayed Kelly with a short burst from the MK-9 fogger and ordered him again to drop the handle and get on the ground."  *Id.*  Both inmates claimed to be a victim in the assault.  *Id.*; *see also id.* at 10 (Kelly's statement dated Jan. 2, 2019).

Kelly continued to complain about his tooth throughout the month of January 2019.  On January 21, 2019, he submitted a sick call slip, again reporting that his tooth had been chipped when he was hit with a mop handle.  ECF 23-2, ¶ 7; ECF 23-3 at 37.

On January 31, 2019, Kelly complained in a sick call slip that he had bumps breaking out around a cut on the right side of his face above his eye.  ECF 23-2, ¶ 8; ECF 23-3 at 45.  He claimed that the problem was caused by mace, but Boward suggests that the problem was "probably related to the cut that had not healed."  ECF 23-2, ¶ 8.

Kelly was seen by Marion Diaz, RN, on February 11, 2019, after a fight with his cellmate.  ECF 23-2, ¶ 9; ECF 23-3 at 90-91.  Kelly's cellmate stabbed him with a pen and Kelly

had put his hands up to defend himself, sustaining superficial stab wounds to the palm of his right hand to his right forearm.  *Id*.  His wounds showed slight bleeding and Diaz cleaned the wounds.  *Id*.

Chelsea Finucane, LCPC, evaluated Kelly on April 3, 2019, at the request of a disciplinary hearing officer because Kelly "became irate and he was not cooperative during his adjustment hearing."  ECF 23-3 at 103.  The hearing officer asked for Kelly "to be assessed by psychology to determine whether he is competent to understand and participate meaningfully in the adjustment hearing and/or whether he was competent to understand and control his behavior at the time of the alleged infraction."  *Id*.  Finucane wrote that she "believe[d] Mr. Kelly has low distress tolerance skills and as a result he can react in an impulsive manner" but that "he is not psychotic."  *Id*.  Further, she determined that Kelly was "competent to attend his adjustment hearing and he was competent when he received his adjustment."  *Id*.

Finucane concludes that she would "complete the Mental Health Pre-Adjustment Hearing Assessment form and send it to the hearing officer stating that he is competent."  *Id*.  There is no similar documentation in the record before this court following the incident of May 28, 2019, in which Kelly was excluded from the resulting adjustment hearing.  Finucane did, however, document her participation in the segregation review of May 28, 2019.  *Id*. at 118.

Kelly submitted a sick call slip on April 4, 2019, requesting a dental exam.  ECF 23-2, ¶ 10; ECF 23-3 at 38.  He complained that he had a bump between his bottom left teeth and had a cracked tooth with bleeding gums.  *Id*.

On April 5, 2019, Kelly requested emergency dental treatment for a lump of bleeding flesh growing between his bottom left teeth that he believed was an abscess.  ECF 23-2, ¶ 11; ECF 23-3 at 39.  Kelly also stated that his front tooth had been chipped during a fight.  *Id*.

On May 28, 2019, the date of the alleged assault, Finucane noted that Kelly had a segregation review hearing.  ECF 23-2, ¶ 12; ECF 23-3 at 118.  When Kelly reported for his review, he was arguing with custody staff regarding the reasons why he was not being allowed to use the phone.  *Id*.  Custody staff reported that Kelly's request to use the phone was denied because he covered the window of his cell.  *Id*.  Finucane noted that Kelly remained highly agitated during the review and that the review team determined he would remain on Administrative/Disciplinary Segregation status pending his transfer to another facility.  *Id*.  It was also determined that Kelly would be required to complete his disciplinary segregation time before he was transferred.  *Id*.

Boward saw Kelly in the dispensary on May 28, 2019, at approximately 12:30 p.m.  ECF 23-2, ¶ 13; ECF 23-3 at 119-20.  At that time, Kelly reported that "'they beat me up'" and that he "hope[d] this goes to court.'"  ECF 23-3 at 119.  Boward recalls that Kelly claimed officers had "punched" him in the face and chipped his tooth, which went into his lip.  *Id*.  He asked Boward to check his dental records, which he maintained would show that his "tooth was not chipped before."  *Id*.

Boward noted that there were no observable injuries to Kelly's face or scalp.  *Id*.  Kelly's right front tooth was chipped and Boward noted a small red mark located on the inside of his lower lip, but no bleeding.  *Id*.  Boward did not see any injuries to Kelly's upper or lower extremities, chest, or back, and noted that his lungs were clear.  *Id*.

Boward states that the dental office was just a few steps away from the area where she was examining Kelly, so she notified them of Kelly's chipped tooth.  ECF 23-2, ¶ 13.  Dental staff advised that Kelly should follow up with a sick call, and Boward prescribed ibuprofen to treat his pain.  *Id*.

Boward denies telling the officer not to conduct a dental exam for Kelly.  ECF 23-2, ¶ 15. She asserts that she documented the injuries as they appeared at the time of the exam and claims that Kelly did not have life-threatening or severe injuries.  *Id*.  Moreover, Boward does not recall anything about seeking charges against Kelly for assault after he accidentally hit her and another nurse during a seizure.  *Id.* ¶ 5.

Kelly acknowledges that, prior to becoming an RN she was an LPN and was tasked with distributing medications to the inmates.  *Id*.  It was her practice at that time to write an infraction for any inmate who touched her hand while she was handing out medication.  *Id.*  However, she does not recall if Kelly was one of those inmates.  *Id*.

Officer Douglas Stegner-Youtzy took photographs of Kelly, documenting his injuries following his medical examination.  ECF 34-15 (Stegner-Youtzy Decl.), ¶ 3.  He states that it is "common for the correctional officer assigned to Administrative Segregation Intake Area ('ASIA') to photograph inmates following a Use of Force."  *Id*.  Stegner-Youtzy explains that he takes "standard photographs" of the inmate, and then works to document all injuries.  *Id.* ¶ 4.  He denies that he was instructed not to photograph Kelly or otherwise document his injuries.  *Id.* ¶ 5.

Stegner-Youtzy recalls that Kelly claimed he was assaulted by officers and sustained a chipped tooth.  *Id.* ¶ 6.  But, Stegner-Youtzy did not see any injuries to Kelly's mouth that would have led to the chipped tooth he claims to have sustained.  *Id*., *see also* ECF 34-13 at 24-26.

In addition to the photographs of Kelly, Stegner-Youtzy took photographs of Cornell (ECF 34-13 at 27), Fignar (*id*. at 28), Davis, which includes a close-up of his hands and the side of his face (*id*. at 29), and Walley (*id*. at 30).  Contrary to Kelly's assertion that Davis's hands showed evidence of an assault against him, the photographs of Davis's hands show no marks on

the hands.  Further, the photographs of Kelly do not support his assertion that his mouth was actively bleeding or that he had sustained multiple blows to his face.

Stegner-Youtzy confirms that Kelly was taken to ASIA and that he was the officer who unlocked the cell for Kelly.  ECF 34-15, ¶ 7.  The following day, Stegner-Youtzy saw that Kelly "had smeared feces over the window of his cell."  *Id.* ¶ 8.

Warden Campbell explains: "When an inmate assaults a correctional officer, it is typical to hold that inmate in 'ASIA' when the assaulted correctional officer works on the inmate's tier." ECF 34-11 (Campbell Decl.), ¶ 9.  He adds, *id.*:  "This is for the safety and protection of both the correctional officer and the inmate."

Lawrence Miller was a major with the Maryland Department of Public Safety and Correctional Services until he retired in December 2019.  ECF 34-16 (Miller Decl.), ¶ 1.  He confirms that Kelly was held in the Administrative Segregation Intake Area after the medical evaluation took place on May 28, 2019.  *Id.* ¶ 4.  He explains that ASIA is a segregation cell used when an inmate requires monitoring due to medical or behavioral issues.  *Id.*

On May 29, 2019, Miller was made aware that Kelly had begun to smear feces over the window of the ASIA cell, as well as the walls.  ECF 34-16, ¶ 5.[10]  He determined that this behavior, coupled with Kelly's recent assault on Davis and the previous threats Kelly made against staff, made Kelly a danger to the safety and operation of correctional officers and the facility.  *Id.*[11]

---

[10] Miller does not state who made him aware of the status of Kelly's cell.  ECF 34-16, ¶ 5.

[11] On March 22, 2019, Officer M. Reel, who is not a defendant in this action, prepared a "Notification of Threat" documenting Kelly's threat to kill Reel while Reel was escorting Kelly to his cell.  ECF 34-21 at 1-2.

Miller believed that Kelly posed an immediate danger to escorting officers and, pursuant to COMAR 12.03.01.13, Miller drafted a memorandum stating that Kelly's adjustment hearing should be held in absentia. *Id.* ¶¶ 5, 6. Miller maintains that the decision to hold the adjustment hearing in absentia was made for the health and safety of the officers who would have had to escort Kelly to the hearing. *Id.* ¶ 7. He concludes: "Following the hearing officer's determination that the hearing would be held in absentia, the hearing officer was permitted to accept testimony by the inmate in the presence of the hearing officer, not at the hearing." *Id.* ¶ 8. However, there is no indication that Kelly provided any testimony.

Kelly was transferred from RCI to NBCI on June 5, 2019. *See* ECF 10-1 (Trasher Decl.), ¶ 5.

## C. Kelly's Opposition (ECF 30; ECF 37)

In opposition to the Boward Motion (ECF 30), Kelly asserts that the medical record submitted by Boward documenting her interaction with him on May 28, 2019, is not signed and is falsified. *Id.* at 6-7. Kelly submits a medical report that is signed by Boward, which he claims was introduced at his criminal trial in the Circuit Court for Washington County and was a factor in his acquittal. *Id.*; *see also* ECF 30-1 at 1-2 (medical record). When compared to the medical record submitted with the Boward Motion, the only difference in the record attached to Kelly's opposition is that Boward's signature appears on the upper right hand corner of the record that Kelly submitted. Compare ECF 23-3 at 119 with ECF 30-1 at 1.

Kelly also takes issue with the fact that Boward did not include a declaration from dental care providers regarding the injuries to his teeth. ECF 30 at 6-7. He notes that the dental records that are provided do not mention Boward consulting with dental staff on May 28, 2019,

regarding Kelly's injuries. *Id*. at 7. He maintains that Boward "immediately joined forces with the cover-up team" by refusing to treat him or document his injuries accurately. *Id*.

Kelly maintains that Boward was "out for revenge" and relies on the sick call slips he submitted regarding his teeth to dispute Boward's claim that she spoke with dental staff on May 28, 2019. ECF 30 at 10. Plaintiff takes issue with the lack of detail in Boward's report and claims this is evidence that she did not do anything with respect to his injuries. *Id*. at 12-13. He claims that Boward's reliance on a prior injury to a different tooth, together with her failure to specify which tooth was chipped when Kelly was brought to the dispensary on May 28, is proof that she did not perform an examination. *Id*. at 13-14. Further, Kelly notes that while Boward said he had no injuries to his face, a Use of Force Report indicates he had a "red mark on cheek." ECF 30-1 at 3. Kelly also disputes that he received Ibuprofen for pain, as claimed by Boward. ECF 30 at 16.

Kelly states that during his criminal trial, which took place in a State of Maryland court on February 24, 2020, there was no dispute that his "teeth were broken off, chipped, and went into his lower lips" and that "[n]o one denied beating [him] up," nor did Boward claim that the condition of Kelly's teeth was the result of a prior injury. ECF 30 at 17. Further, Kelly points out that Boward acknowledges that he had a wound on his lower leg but did not document it in her report. Rather, she simply minimized it by describing it as small. *Id*. at 18.

In opposition to the State Defendants' Motion (ECF 37), Kelly again disputes that he suffered only a minor injury to the inside of his mouth as a result of the use of force against him on May 28, 2019. *Id*. at 2. He points out that there is no dispute that he remained handcuffed behind his back throughout both uses of force; that he was wearing only flip-flops during the incident involving Walley and Davis; and he did not do anything to provoke the assaults against

him.  *Id*. at 4.  He maintains that he was silent after leaving the segregation review and was not

unruly or uncooperative on the way back to his cell.  *Id*.  Kelly also contests the accounts by

Walley and Davis, who said that there was a sheet hanging from the ceiling in plaintiff's cell and

that even if that were so, two officers are not required for the task of pulling it down.  *Id*.

Kelly suggests that the reports written by the officers in connection with the Use of Force

report were altered because the dates are entered in different styles, some with slashes and others

with dashes.  ECF 37 at 7 (referencing ECF 34-21 at 4).  Further, he contends that the testimony

given at the criminal trial charging him with assault on a correctional officer differs from the

reports written by the officers.  *Id*. at 8.  According to Kelly, Walley testified at trial that he and

Davis went into Kelly's cell to search it, "looking for 'juice containers' that might be used to

hold feces and be thrown on officers."  *Id*. at 9.  Kelly states that inmates who are assigned to

disciplinary segregation are not given juice containers.  *Id*.  Kelly also recalls that Walley

testified that Kelly walked into his cell and began jumping up and down.  *Id*.  But, Kelly

maintains that at trial, Walley did not state that the sheet was hanging from the ceiling of Kelly's

cell, nor did he say Kelly was ordered to remain outside of the cell.  *Id*. at 10.

Kelly also notes that in the context of this case, defendants maintain he did not file any

administrative remedy procedure requests ("ARPs").  However, he points to Finucane's report of

May 28, 2019, stating that when Kelly asked for an ARP form during his segregation review

hearing, "custody staff report[ed] he has already filed about 10 ARPs this month."  ECF 37 at 10;

*see also* ECF 23-3 at 118 (Finucane report).  Kelly suggests that this is an example of the

dishonesty with which the State Defendants have responded to his Complaint, claiming falsely

that they allege they had no knowledge of any ARPs filed by him while he was at RCI and

therefore did not retaliate against him.  ECF 37 at 10.  In Kelly's view, Finucane's report proves

the falsity of the Declaration made by Jason Griffith that Kelly filed only one ARP while at RCI. *Id.* at 11; *see also* ECF 34-20 (Decl. of Jason Griffith), ¶ 3. To the extent that Kelly's ARPs were not processed, he claims this proves that correctional officers threw them away or otherwise mishandled them. ECF 37 at 11. Kelly adds that his outgoing mail was also thrown away or was not sent out of the institution, similar to the fate of his ARPs. *Id.*

With respect to Boward's report of Kelly's injuries, to support his argument that the report is false Kelly relies on a typographical error in one copy of the report that says his tooth was "shipped" instead of "chipped," as noted in a different copy of the report. ECF 37 at 12.

Kelly points out that Fignar's Declaration, stating that he heard a "commotion" coming from the area of Kelly's cell and reported to the area for assistance, also states that Kelly was standing on the tier, handcuffed behind his back. ECF 37 at 13. Kelly suggests that the "commotion" heard by Fignar supports Kelly's claim that Walley and Davis were inside his cell, tossing his belongings around, searching for Kelly's log. *Id.* Kelly also claims Fignar gave a different account of the incident during Kelly's criminal trial. *Id.*

Kelly takes issue with Cornell's Declaration and claims it constitutes a "new version" of the incident because he also states he heard yelling coming from the area of Kelly's cell. ECF 37 at 13. He relies on the perceived discrepancies in the declarations of Fignar and Cornell to support his claim that the pair lied in their subsequent reports when they said that Kelly jerked away from their grasp and kicked the door. *Id.*

In Kelly's view, Fignar's acknowledgement that he saw a small cut inside of Kelly's mouth refutes Cornell's claim that he saw no injuries and Boward's description of a red mark on the inside of Kelly's mouth. ECF 37 at 14. He argues that a small cut is not the same as a red mark. *Id.* Kelly also argues that the photographs that were taken of him did not show all areas

of his body where he sustained blows, such as his torso, because the photographs were taken while he was fully clothed.  *Id*. at 21.  He claims that the photographs of the officers' hands do not include a picture of Davis's hands, and he argues that photographs of Davis would have shown injuries to Davis's hands, consistent with assaulting Kelly in the manner Kelly describes in his Complaint.  *Id*.  However, pictures of Davis, who is displaying his hands for the camera, include a picture of his face and do not show injuries to his hands.  *See* ECF 34-13 at 29 (photographs of Davis).

Kelly also claims that the ASIA cell where he was placed after the incident was unsanitary when he got there and that he was not responsible for smearing feces on the window.  Rather, he claims he was placed in that cell to hide his injuries.  ECF 37 at 21, 24.  According to Kelly, he was being hidden from sight due to his injuries and this explains why he remained there for eight days prior to being transferred.  *Id*. at 21.  Kelly notes that the ASIA logbook submitted by the State Defendants as an exhibit with their motion skips entries for May 30 and 31, 2019.  *Id*. at 24; *see also* ECF 34-17.

The logbook indicates that Kelly was smearing "things" on the cell window to obstruct the officers' view inside the cell.  ECF 37 at 24-25.  Kelly asserts that Stegner-Youtzy, who made this observation, specifically did not say feces because it was not true.  *Id*. at 25.  He also claims that Miller was disappointed to see that the cell had been cleaned by Kelly and no longer had feces smeared around the cell.  *Id*.  Kelly suggests that the missing pages of the logbook would have established that other officers did not see feces on the window or in the cell, proving that Miller and Stegner-Youtzy had fabricated their reports for the purpose of keeping Kelly away from the adjustment hearing and hiding his physical condition.  *Id*.

## II.      Plaintiff's motion for injunctive relief

### A.

Kelly seeks to enjoin officials at NBCI from forcing him into general population, sharing a cell with another inmate, and continuing to give him notices of infraction for refusing housing. He maintains that, despite assurances of the investigation of his claims regarding the danger to his life by Bloods and BGF gang members, the response to show cause order establishes this was not the case.   He maintains that this court was misled when counsel for the Division of Correction filed the initial response to show cause indicating that plaintiff was moved to administrative segregation for the purpose of protective custody.   Rather, Kelly maintains that he was not put on administrative segregation/protective custody, but he was placed in regular administrative segregation with an indication that there is "reason to believe" his is a "threat to the security of the institution" as support for the assignment.   ECF 18 at 3.

The response to show cause does not simply indicate that Kelly was moved to administrative segregation/protective custody.   Rather, there was no evidence that Kelly had validated enemies housed at NBCI.   ECF 10-3 (Decl. of Richard Roderick, NBCI Case Management Manager), ¶ 5.   Further, the NBCI staff assert that this case is the first notification they received that Kelly had any concerns about his safety in general population at NBCI.   *See* ECF 10-1, ¶¶ 9, 10; ECF 10-3, ¶¶ 6-8; ECF 10-4, ¶ 7.

Megan Thrasher, the Correctional Case Management Specialist assigned to disciplinary segregation housing at NBCI, explains that part of her job is to determine if inmates can be returned to general population upon expiration of their segregation sentence.   ECF 10-1 (Thrasher Decl.), ¶ 4.   To that end, Thrasher is required to review an inmate's Enemy Alert and Retractions page in the Offender Case Management System ("OCMS"), the inmate's institutional

base file, and any other available sources of information that would "indicate general population placement could . . . pose a threat to the inmate or overall security of the institution." *Id*.

With respect to Kelly's case, Thrasher explains that he was transferred to NBCI on June 5, 2019, and his disciplinary segregation sentence of 250 days, imposed in connection with the assault on Davis, ended on March 24, 2020.   ECF 10-1, ¶ 5.   Since the end of plaintiff's disciplinary segregation sentence, Kelly has refused on four occasions to leave his cell for transfer to general population.   *Id*. ¶ 6.   Each time he has refused he has received a Notice of Infraction and received a disciplinary segregation sentence of 60 days.   *Id*.   Prior to the end of his segregation expiration dates, Thrasher has been unable to find any verified enemies in the general population at NBCI.   *Id*. ¶ 7.

On September 23, 2020, following Kelly's filing of this suit, Kelly was interviewed by NBCI Intelligence Lt. David Barnhart.   ECF 10-1, ¶ 13.   Lt. Barnhart determined, based on his interview of Kelly, that Kelly requires assignment to administrative segregation following completion of his disciplinary segregation sentence.   *Id*.   At the time of the response, the only listed enemies for Kelly were Jeffrey Southall and Dominic Frazier, neither of whom is confined at NBCI.   ECF 10-2 at 7.

On September 28, 2020, Case Management staff recommended that Kelly be reassigned from disciplinary segregation to administrative segregation based on "information received from the NBCI Intelligence Department."   ECF 10-2 (Decl. of Benjamin Bradley, Correctional Case Manager II), ¶ 4.   Bradley explains that administrative segregation "is a status where an inmate is housed and separated from general population inmates in response to a potential threat to the overall safety, security and good order of [the] institution."   *Id*. ¶ 5.   Use of this housing assignment "alleviate[s] the possibility of verified enemies coming in contact in general

population."  *Id*.  While Kelly is assigned to either administrative or disciplinary segregation, Kelly is provided meals in his cell and is only permitted to attend recreation by himself or with an approved cell partner.  *Id*. ¶ 6.

### B.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see also SAS Institute, Inc. v. World Programming Lmtd*, 874 F.3d 370, 385 (4th Cir. 2017) (satisfying four-prong test is "a high bar, as it should be.").  A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent."  *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).  In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).

An additional consideration is required when injunctive relief is sought in the context of prisoner civil rights case.  Section 3626(a)(2) of 18 U.S.C. states:

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in

paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

"[T]o survive summary judgment, [plaintiff] must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

Although Kelly disagrees with the rationale provided in the notice of assignment to administrative segregation, that rationale does not negate the fact that he has been separated from the general population, where he maintains there is a threat to his safety. *See* ECF 18 at 3. Because steps have been taken to keep Kelly out of general population, which is the relief he sought, there is no evidence that defendants are knowingly and unreasonably disregarding an objectively intolerable risk to his safety.

The motion for injunctive relief (ECF 18) shall be denied.

### III.   Plaintiff's motion for physical and mental examinations

Kelly filed a motion for physical and mental examinations.  ECF 31.  He argues that he should be subjected to a physical examination by an outside, licensed provider without ties to the defendants to establish that he was assaulted and that Boward did not document the injuries he had when she saw him on May 28, 2019. *Id.* at 2.  Further, he argues that other people noticed his injuries, yet Boward's report indicates he had no injuries. *Id.*

34

Boward observed no injuries to Kelly's face or scalp, which is confirmed by the photographs taken of Kelly shortly after the examination, and noted that his "right front tooth was chipped and a small red mark was located on the inside of his lower lip." ECF 23-2 at 5; ECF 23-3 at 119-20. Boward took Kelly's vital signs, noted no shortness of breath, and saw no injuries to his upper and lower extremities. *Id.*

An independent physical or mental examination, some two-years after the fact, is unlikely to lead to evidence that would aid Kelly in opposing the motions of Boward or the State Defendants. Therefore, his motion for physical and mental examinations shall be denied.

### IV. Plaintiff's motion for Clerk's entry of default

Kelly's motion for clerk's entry of default (ECF 33) was received by the court on March 29, 2021, three days after defendants filed a motion for extension of time (ECF 32). Kelly asserts in his motion that "[m]ore than 20 days had elapsed" since defendants had been granted an extension of time to and including March 12, 2021. ECF 33 at 1. Kelly is correct that defendants missed the deadline of March 12, 2021, either to respond to the Complaint or seek more time to do so.

Under Fed. R. Civ. Proc. 55(a), default may be entered "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." However, the failure to plead or defend does not automatically entitle a plaintiff to entry of default judgment. The decision to enter default is left to the discretion of this Court. *See Dow v. Jones*, 232 F. Supp. 2d 491, 494 (D. Md. 2002).

Entry of default judgment is not favored and is reserved in cases where the adversary process has been halted by an unresponsive party. *See United States v. Shaffer Equip. Co.*, 11 F. 3d 450, 453 (4th Cir. 1993). This Court does not condone counsel's failure to comply with

deadlines set by the Court. But, the litigation in this matter was not impacted by that failure in this case. The motion for Clerk's entry of default shall be denied.

### V.      Legal Standards

### A.

Plaintiff's claims are predicated on 42 U.S.C. § 1983. Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any "person" who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g., Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Graves v. Loi*, 930 F.3d 307, 318-19 (4th Cir. 2019); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)).   A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (Citations and internal quotation marks omitted).

## B.

Defendants' motions are styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.   A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).   Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).   But, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222(4th Cir. Nov. 29, 2016) (per curiam).   However, when the movant expressly captions its motion "in

the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[12]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc*., 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that

---

[12] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp*., 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub. nom.  Garder v. Ally Fin., Inc.*, 514 Fed. Ap'x 378 (4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the nonmoving

party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.  Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).  Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Defendants' motions shall be considered as motions for summary judgment.  For several of the claims, there has been no demonstrated need for the discovery sought by Kelly.  And, construing the motions under Rule 56 will facilitate resolution of the case.  However, as to those claims for which I deny summary judgment, discovery may be appropriate.

## C.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018);

*Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

 "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346

F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24.  But, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hixson v. Moran*, ___ F.3d ___, 2021 WL 2460406, at *3 (4th Cir. June 17, 2021); *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  That said, "a party's 'self-serving opinion ... cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc*., 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)).  In other words, "[u]nsupported speculation is not sufficient to defeat a

summary judgment motion." *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *see Harris v. Home Sales Co*., 499 F. App'x 285, 294 (4th Cir. 2012).

In sum, to avoid summary judgment, there must be a genuine dispute as to material fact. In *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 238, the Court reiterated: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323–24).

## VI.    Eighth Amendment – Use of Force

### A.

The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const, amend. VIII; *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein,* 825 F.3d 206, 218 (4th Cir. 2016). Notably, it "proscribes more than physically barbarous punishments." *Estelle*, 429 U.S. at 103. It also "embodies" the "'concepts of dignity, civilized standards, humanity, and decency . . .'" *Id.* (citation omitted). Thus, the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); *cf. DeShaney v. Winnebago Cnty. Dep't*

*of Soc. Servs.*, 989 U.S. 189, 199-200 (1989) (stating that when a state holds a person "against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being"); *John Doe 4 v. Shenandoah Valley Juvenile Center Comm'n*, 985 F.3d 327, 338-39 (4th Cir. 2021).

The Fourth Circuit has observed that "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)).

"In assessing a claim of excessive force, courts ask 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'" *Lombardo v. City of St. Louis, Missouri*, ___ U.S. ___, 141 S. Ct. 2239, 2241 (2021) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989) (some internal quotation marks omitted); *see also Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Notably, "the inquiry 'requires careful attention to the facts and circumstances of each particular case.'" *Lombardo*, 141 S. Ct. at 221 (quoting *Graham*, 490 U.S. at 396).

A prisoner's Eighth Amendment claim of excessive force involves both an objective and a subjective component. *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019). The objective component asks whether the force was sufficiently serious to state a claim. *Id.* But, this "is not a high bar, requiring only something more than '*de minimis*' force." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 10 (1992)); *see also Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (per curiam). The subjective component asks whether the officer "'acted with a sufficiently culpable state of mind.'" *Brooks*, 924 F.3d at 112 (citation omitted). And, "this is a demanding

standard . . . ." *Id.* Notably, the state of mind is one of "'wantonness in the infliction of pain.'" *Id.* at 112-13 (quoting *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008)).

Whether the force used by a prison official was wanton is determined by inquiring if the "'force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Hudson*, 503 U. S. at 6 (citation omitted; some quotation marks omitted). The Court must consider the need for the application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made by prison officials to temper the severity of their response. *Lombardo*, 141 S. Ct. at 2241; *Kingsley*, 576 U.S. at 397; *Whitley*, 475 U.S. at 321.

A corrections officer acts in a "'good faith effort to maintain or restore discipline,'" *i.e.*, with "a permissible motive," when confronting "immediate risks to physical safety" and when attempting to "'preserve internal order' by compelling compliance with prison rules and procedures." *Brooks*, 924 F.3d at 113 (quoting *Hudson*, 503 U.S. at 6-7). In contrast, the use of force "to punish an inmate for intransigence or to retaliate for insubordination" would "cross the line into an impermissible motive." *Brooks*, 924 F.3d at 113.

The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins*, 559 U.S. at 38; *see Ussery v. Mansfield*, 786 F.3d 332, 336 (4th Cir. 2015). The extent of injury is one factor indicative of whether the force was necessary in a particular situation. But, if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner "had the good fortune to escape without serious injury." *Wilkins*, 559 U.S. at 38.

**B.      Use of Force in Kelly's cell**

The undisputed facts establish that Kelly was agitated following his segregation review hearing.  The parties dispute the events that occurred prior to the segregation review hearing, but they all agree that Kelly's cell was, at some point, not in compliance with regulations.  This is because the view into his cell was obstructed either by a sheet hanging from the ceiling, as asserted by defendants, or a piece of paper covering the cell window, as Kelly claims.

Kelly maintains that Davis and Walley went into his cell to search it and that they brought him into the cell while they did so.  None of the other parties confirmed that Kelly's cell was being searched.  Indeed, Kelly was denied a telephone call slip due to the status of his cell, lending credence to defendants' assertion that they went into the cell to bring Kelly's cell into compliance with institutional rules.

Whether Kelly charged into the cell while Davis and Walley were pulling the sheet down from the ceiling is a disputed fact that is clearly material.  The disputed fact is material because defendants rely upon it to justify the force used against Kelly.  And, as to Fignar and Cornell, Kelly claims that they assisted in the commission of the assault.  Moreover, Kelly was acquitted of the criminal charges filed against him by the State of Maryland, in which he was accused of assault.  However, the record here does not appear to include any of the evidence introduced at that trial.

Given the material nature of this factual dispute, summary judgment must be denied as to the claims against Walley, Davis, Fignar, and Cornell.  Summary judgment is premature as to them.

### C.      Use of Force in Lobby – Fignar and Cornell

Kelly admits that while he was being escorted to medical by Fignar and Cornell, he kicked an office door to get the attention of the staff inside the office.  Kelly's actions in doing so created the basis for Fignar and Cornell to take Kelly to the floor to prevent his further disruption of institutional business.

Whether Kelly jerked away from Fignar and Cornell during the escort is not material to the use of force employed.  The undisputed facts establish that Kelly engaged in conduct that was disruptive, which required a response from Fignar and Cornell during the escort.  Kelly's allegations with respect to this use of force do not include claims that he was beaten, punched, or kicked.  Rather, his description is consistent with the reports by Fignar and Cornell.

Further, the force used against Kelly during this encounter was the minimal amount of force needed to regain control over him and did not include gratuitous, merciless infliction of harm.   "[O]nly the unnecessary *and wanton* infliction of pain implicates the Eighth Amendment."  *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotations in *Wilson*); *see Hixson*, 2021 WL 2460406, at *3.  These defendants are entitled to summary judgment as to this claim.

### VII.    Eighth Amendment – Medical Care

### A.

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable

measures to guarantee the safety of . . . inmates." *Whitley*, 475 U.S. at 319-20; *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).

In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failure to protect inmates from attack, inhumane conditions of confinement, and failure to render medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson*, 501 U.S. at 303; *Hixson v. Moran*, 1 F. 4th 297 (4th Cir. 2021)[13]; *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). "It is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (citation omitted).

The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38); *see Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

Of relevance here, in order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Lightsey*, 775 F.3d at 178; *Iko v. Shreve*, 535 F. 3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

---

[13] Curiously, the version of the opinion that appears on West Law does not yet include pagination.

An Eighth Amendment claim for deliberate indifference to serious medical needs "includes objective and subjective elements." *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *See Farmer*, 511 U.S. at 837; *see also Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Hixson*, 2021 WL 2460406, at *3; *Gordon v. Schilling*, 937 F.3d 348, 357 (4th Cir. 2019); *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King*, 825 F.3d at 219. As the *Heyer* Court put it, "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." *Heyer*, 849 F.3d at 209-10.

A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Mays*, 992 F.3d at 300. Proof of an objectively serious medical condition, however, does not end the inquiry. As the Court explained in *Heyer*, 849 F.3d at 209-10: "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry."

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial risk of serious harm.'" *Heyer*, 849 F.3d at 210 (quoting *Farmer*, 511 U.S. at 837) (emphasis added in *Heyer*); *see Thompson*, 878 F.3d at 97-98. But, in a case

involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

In the context of a claim concerning medical care, the subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837. Similarly, the Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see Young*, 238 F.3d at 575-76 ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care."); *see Mays*, 992 F.3d at 300.

As the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" (citation omitted). Put another way, "it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*).

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk

50

cannot be said to have inflicted punishment.'"   *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).   Moreover, "[t]he necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care."   *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*).

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."   *Id.*; *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.").   Moreover, mere negligence or malpractice does not rise to the level of a constitutional violation.   *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle*, *supra*, 429 U.S. at 106).   Further, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable."   *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'"   *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835).   A

plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). In other words, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice*, 58 F.3d at 105.

But, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012).

In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842 114 S.Ct. 1970). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Even if the requisite subjective knowledge is established, however, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light

of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

## B.

Kelly's description of his encounter with Boward following the two use of force incidents is inconsistent with the verified medical records documenting his vital signs and his injuries. Further, the photographs taken of Kelly show at most a superficial wound to his lower leg and a red mark inside his mouth. His teeth are not broken or lodged in his lip, as he claimed, nor are there any apparent injuries to his eyes. The medical records, which include sick call slips written by Kelly, indicate that Kelly's issues with his teeth and mouth pre-dated the May 28, 2019 incident by at least five months.

To the extent that Kelly had issues with his teeth during his encounter with Boward, she checked with dental staff during Kelly's encounter to inquire about having the issues treated and was told to advise Kelly to submit a sick call slip. The assessment of Kelly's medical status revealed no serious medical or dental needs requiring emergency treatment. To the extent Kelly had lingering symptoms caused by the use of force against him, he was transferred from RCI to NBCI approximately one week later, leaving Boward no opportunity to address any subsequent complaints. Boward's treatment of Kelly on May 28, 2019, did not violate his Eighth Amendment rights, given the absence of objective evidence of a serious medical or dental need.

## VIII.   Eighth Amendment - Failure to Protect

### A.

Plaintiff asserts a failure to protect claim against various defendants. In order to prevail on an Eighth Amendment claim of failure to protect from violence, plaintiff must establish that

the named defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). "Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penologicial objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 833-34 (citations omitted).

However, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837; *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor*, 817 F.3d at 127 (citing *Farmer*, 511 U.S. at 832). Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Id*. But, "not every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

## B.

Kelly's failure to protect claim, lodged against Warden Bishop, Richard Roderick, and Megan Thrasher, fails to satisfy the requirements under the Eighth Amendment. Bishop,

Roderick, and Thrasher each aver they knew nothing of Kelly's fears regarding general population assignment at NBCI until they were named in this lawsuit. *See* ECF 10-1 (Decl. of Thrasher), ¶ 9; ECF 10-3 (Decl. of Roderick), ¶ 6; and ECF 10-4 (Decl. of Bishop), ¶ 7. At that time, Kelly was placed on administrative segregation to allow for investigation into his claims of a threat to his safety posed by other inmates who are gang members.

Kelly focuses his dispute with the NBCI defendants' actions on the reasons listed for his assignment to administrative segregation, and takes umbrage with the lack of a notation that it is for his protection. But, the undisputed fact remains that Kelly has not been put into general population, and his fears have not been disregarded. Summary judgment shall be granted as to Bishop, Roderick, and Thrasher.

Kelly's claim against Barnhart concerns the delay in Kelly's transfer from RCI after it was established that his life was endangered by other inmates incarcerated there. ECF 1 at 17-18, ¶ 43. Warden Casey Campbell's Declaration (ECF 34-11) establishes that the delay in securing a place for Kelly in a different medium security prison was caused by a lack of bed space, a factor over which none of the defendants had any control. *Id.* ¶¶ 5-7. Barnhart's Declaration also confirms that Kelly was on a transfer list for a medium security prison and that he was kept away from general population while he waited for the transfer. *See* ECF 34-12 at ¶¶ 8-10.

Barnhart's participation in Kelly's housing assignments while at RCI are little more than administrative in nature and do not evidence any objective or subjective intent to cause him harm. Summary judgment shall be granted as to Barnhart.

## IX.    Fourteenth Amendment Due Process Claim

### A.

Kelly contends that his due process rights were violated in connection with his adjustment hearing, which he was not permitted to attend.  Prisoners retain rights under the Due Process Clause of the Fourteenth Amendment.  But, prison disciplinary proceedings are not part of a criminal prosecution and the full array of rights due a defendant in such proceedings does not apply.  *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citing *Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)).

In prison disciplinary proceedings, where an inmate faces the possible loss of diminution credits, he is entitled to certain due process protections. These include: (1) advance written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing where he is afforded the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker.  *See Wolff*, 418 U.S. at 564-66, 592.

However, there is no constitutional right to confront and cross-examine witnesses or to retain and be appointed counsel.  *See Baxter v. Palmigiano*, 425 U.S. 308, 322 (1976); *Brown v. Braxton*, 373 F.3d 501, 504-05 (4th Cir. 2004).   As long as the hearing officer's decision contains a written statement of the evidence relied upon, due process is satisfied.  *See Baxter*, 425 U.S. at 322, n.5.  Moreover, substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence."  *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985); *Tyler v. Hooks*, 945 F.3d 159, 171 (4th Cir. 2019) (stating that "the 'some

evidence' standard is extremely broad in scope and presents a very low burden for prison officials to meet").

## B.

Kelly maintains that Miller's report, stating that Kelly represented a potential threat of harm to institutional staff and that his adjustment hearing should be held in absentia in light of that threat, was simply a ruse to keep Kelly from attending his hearing.  According to Kelly, Miller fabricated the assertion that Kelly smeared feces on the window of his cell, which is contradicted by Stegner-Youtzy's report.  But, his observation that the ASIA logbook is missing pages for May 30 and 31, 2019, is well-taken.  Further, this Court notes that there is no evidence in the record that Kelly's mental status was evaluated prior to this disciplinary hearing to determine if he presented a threat to the safety and security of prison staff, as had been done before.  The absence of that evidence lends credence to Kelly's claim that there was no valid reason for holding the hearing in absentia.

Procedural due process for a prison disciplinary hearing is not violated when a prisoner is tried in absentia due to safety issues that threaten prison staff.  However, the documentation of the alleged threat here is severely lacking.  Summary judgment on this claim shall be denied with respect to defendant Miller's involvement in procuring an adjustment hearing in absentia.

## X.        First Amendment Claim – Retaliation

Plaintiff seems to allege a claim that he suffered retaliation for the exercise of his First Amendment right to petition for the redress of grievances.  "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right."  *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). A plaintiff can establish this element of retaliatory conduct if the defendant took an action that would "deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine*, 411 F.3d at 500).

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987); *see Desper v. Clarke*, 1 F.4th 236, 242 (4th Cir. 2021). Nevertheless, "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," although "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has said that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 545 (4th Cir. 2017).

Kelly must demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. *Id.*

The State Defendants assert that they were unaware of any ARPs filed by Kelly and have submitted the Declaration of Jason Griffith (ECF 34-20), the ARP Coordinator for the Department of Public Safety and Correctional Services. *Id.* ¶ 1. He stated that Kelly filed only one ARP while he was at RCI. *Id.* ¶ 3. It concerned food that he purchased at the commissary. *Id.* As Kelly has pointed out, this assertion is belied by other verified records, particularly the report by Chelsea Finucane, stating that a correctional officer confirmed that Kelly had filed ten ARPs in the month prior to May 28, 2019.

As I see it, there is a genuine dispute of material fact relative to Kelly's retaliation claim. The retaliation itself – an alleged assault and subsequent transfer to maximum security – is sufficient to discourage an ordinary prisoner from accessing the administrative remedy procedure for redress of grievances. Summary judgment shall be denied on this claim.

## XI.     Fourth Amendment Claim – Cell Search

The parties dispute whether Davis and Walley entered Kelly's cell to search it. But, the dispute is of no legal consequence in connection with Kelly's Fourth Amendment claim. This is due to the fact that, as a convicted prisoner, Kelly has no federal constitutionally protected privacy interest in his prison cell. *See Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984) (prisoners have no subjective expectation of privacy in prison cell and Fourth Amendment proscription against unreasonable searches has no application).

The Fourth Amendment claim is without merit. Therefore, I shall grant the State Motion as to this claim.

## XII.     Supervisory Defendants

Kelly names as defendants Commissioner Wayne Hill and Warden Casey M. Campbell. His claims as to these defendants are connected with their status as supervisors and, in the case

of Hill, do not include allegations of personal participation in the alleged constitutional violations raised.

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation.  It is well established that the doctrine of respondeat superior does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).  Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Given the absence of any personal involvement by Hill, he is entitled to summary judgment in his favor.

Campbell also asserts that he is entitled to judgment because he was not personally involved in any of the incidents underlying the claims asserted by Kelly.  ECF 34-11 (Decl. of Casey Campbell).  Rather, Campbell explains that he relied on other staff members to investigate

an inmate's claim of fear for his life, and follows the recommendations made after completion of an investigation. *Id*. at ¶ 4.

Campbell's signature appears on the use of force reports that were prepared after the incidents of May 28, 2019, but his signature alone is insufficient to establish liability for the use of force employed by the correctional officers. *See*, *e.g.*, *Whitington v.Ortiz,* 307 Fed. App'x 179, 193 (10th Cir. 2009) (denial of an ARP request alone does not impose liability); *Larson v. Meek,* 240 Fed. App'x 777, 780 (10th Cir. 2007) (same). There is no evidence that Campbell knew and approved of holding Kelly's adjustment hearing in absentia. The documents indicating the rationale for holding Kelly's hearing in absentia are not signed by Campbell, nor are they addressed to him. ECF 34-8 at 46-47, 56. Additionally, there is no indication that Kelly appealed the adjustment decisions to Warden Campbell. *Id*. at 38 and 55. Campbell's position as Warden is not enough to impose liability. Summary judgment shall be granted in favor of Hill and Campbell.

## XIII.   Qualified Immunity

### A.

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Barrett v. PAE Government Services, Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 589 (2018)) (cleaned up); *see also Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Hunter v.*

*Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015).  In *Owens*, 767 F.3d at 395, the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  (Quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Barrett*, 975 F.3d at 428-29; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018);  *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015).  The cases are legion in support of these principles.  *See*, *e.g.*, *Wesby*, 137 S. Ct. at 589; *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Robertson*, 989 F.3d at 288; *Ray v. Roane*, 948 F.3d 222, 229-30 (4th Cir. 2020); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Wilson*, 893 F.3d at 219; *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582-83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow*, 457 U.S. at 818.  An officer who

makes an honest but objectively unreasonable mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord Robertson*, 989 F.3d at 288 ("'[I]n gray areas, where the law is unsettled or murky, qualified immunity affords protection to' government officials who take 'action[s] that [are] not clearly forbidden.'") (quoting *Occupy Columbia*, 738 F.3d at 118); *Brawn v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (observing that qualified immunity protects government officials from liability for "'bad guesses in gray areas'") (citation omitted).  In other words, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (per curiam).

Thus, "even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him

from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170).

Notably, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818. Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231.

Of relevance here, qualified immunity is an "'*immunity from suit* rather than a mere defense to liability[.]'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*). Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526). However, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry v. Purnell*, 501 F.3d, 374, 377 n.2 (4th Cir. 2007) (citation omitted).

The Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." *Scinto*, 841 F.3d at 235 (citations omitted); *see also Cannon v. Village of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018). Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable

to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Wesby*, 138 S. Ct. at 589; *Ray*, 948 F.3d at 226; *Owens*, 767 F.3d at 395-96.

The "two inquiries . . . may be assessed in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Ray*, 948 F.3d at 226; *Labowitz*, 885 F.3d at 260; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018). "The plaintiff bears the burden of proof on the first question—i.e., whether a constitutional violation occurred .... [and] [t]he defendant bears the burden of proof on the second question—i.e., entitlement to qualified immunity." *Henry*, 501 F.3d at 377–78 (internal citations omitted).

If an officer is shown to have violated the rights of a plaintiff, courts must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson*, 893 F.3d at 219. This is a question of law for the court to resolve. *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other

hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

To determine whether the right was clearly established, the court first must define the right at issue. *Scinto,* 841 F.3d at 235; *see Occupy Columbia*, 738 F.3d at 118. "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Creighton*, 483 U.S. at 640). Notably, "a right may be clearly established by any number of sources, including a . . . case, a statute, or the Constitution itself." *Owens,* 767 F.3d at 399; *see Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017).

Generally, to "determine whether a right is clearly established," courts "assess whether the law has 'been authoritatively decided by the Supreme Court,[] the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson*, 893 F.3d at 221 (citation omitted); *see Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.,* 597 F.3d 163, 176 (4th Cir. 2010) (stating that "'ordinarily [courts] need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose'" as of the date of the conduct at issue), *cert. denied*, 562 U.S. 890 (2010). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 574 U.S. at 16-17 (quoting *al-Kidd*, 563 U.S. at 741); *see Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1152 (2018); *White v. Pauly,* ___ U.S. ___, 137 S. Ct. 548, 551 (2017) (per curiam); *San Francisco v. Sheehan,* 575 U.S. 600, 611 (2015); *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014); *see also Reichle*, 566 U.S. at 664 ("To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right.'") (citation and some quotation marks omitted).

However, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson*, 893 F.3d at 221; *see Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("[A] 'general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful.'") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017). Indeed, the Supreme Court has never required a "'case directly on point for a right to be clearly established.'" *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551); *see al-Kidd*, 563 U.S. at 741; *see also Crouse*, 848 F.3d, at 582-83. Thus, "even without 'directly on-point, binding authority,' qualified immunity is inappropriate if 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Ray*, 948 F.3d at 229-30 (quoting *Booker*, 855 F.3d at 543).

But, "courts are 'not to define clearly established law at a high level of generality.'" *Wilson*, 893 F.3d at 221 (quoting *Kisela*, 138 S. Ct. at 1152); *see also Sheehan*, 135 S. Ct. at 1775-76; *Plumhoff*, 572 U.S. at 779. Rather, courts are to "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams*, 884 F.3d at 227 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).

The central question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)); *see Bland*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal

quotations omitted).

At summary judgment, "a court, when viewing facts in the light most favorable to the plaintiff, and drawing all reasonable inferences in the plaintiff's favor, must determine whether defendant is entitled to qualified immunity." *Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (citing *Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019)); *see Brown v. Elliott*, 876 F.3d 637, 641–42 (4th Cir. 2017) ("[W]hen resolving the issue of qualified immunity at summary judgment, a court must ascertain the circumstances of the case by crediting the plaintiff's evidence and drawing all reasonable inferences in the plaintiff's favor.") (internal quotation marks omitted).

## B.

Defendants' qualified immunity defense is unavailing both because the constitutional rights were well established at the time of the incidents at issue and because there exists a material dispute of fact regarding whether the conduct allegedly violative of plaintiff's constitutional rights actually occurred.  *See Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005).  Moreover, the defense of "[q]ualified immunity does not . . . override the ordinary rules applicable to summary judgment proceedings."  *Willingham*, 412 F.3d at 559 (citing *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992)).

As noted, there are genuine disputes of material fact regarding whether the force used against Kelly by Walley, Davis, and others was excessive; whether Kelly's exclusion from his adjustment hearing denied him his right to due process; and whether force was used in retaliation for Kelly's ARP complaints, which were seemingly destroyed or confiscated.  The controlling law on each of these claims is well settled.

## XIV.  Conclusion

Based on the foregoing, and by separate Order which follows, Kelly's motions for preliminary injunction (ECF 18), for physical and mental examinations (ECF 31), and for default (ECF 33) are denied; plaintiff's motion to amend (ECF 8) is granted; defendants' motions to strike (ECF 21) and for extension of time (ECF 32) are granted; defendant Boward's motion to dismiss or for summary judgment (ECF 23) is granted; and the State Defendants' motion to dismiss or for summary judgment (ECF 34) is denied in part and granted in part.


July 19, 2021                                         /s/           
Date                                             Ellen L. Hollander
                                               United States District Judge