IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KEITH DARNELL KELLY,

  *Plaintiff*,

v.

LAWRENCE F. MILLER, *et al.*,

  *Defendants*.

Civil Action No. ELH-20-2531

**MEMORANDUM OPINION**

Keith Darnell Kelly, a Maryland prisoner, filed a civil rights lawsuit under 42 U.S.C. § 1983, which he has twice amended.  *See* ECF 1 (the "Original Complaint"); ECF 8 (the "First Amended Complaint" or "FAC"); ECF 53 (the "Second Amended Complaint" or "SAC").  The Original Complaint and the First Amended Complaint were filed while Kelly was self-represented, and the Second Amended Complaint was filed by appointed counsel.

Kelly has lodged several claims against various defendants, principally stemming from an alleged use of force incident that occurred on May 28, 2019.  The Original Complaint named twelve defendants, and the First Amended Complaint added four more.  *See* ECF 8, ¶ 16.[1]

As to the original Complaint, the defendants moved to dismiss or for summary judgment.  *See* ECF 23; ECF 34.  In a Memorandum Opinion (ECF 40) and Order (ECF 41-2) of July 19, 2021, the Court denied the motion as to three claims against five of the original defendants. The claims are use of force, in violation of the Eighth Amendment; denial of due process, in violation of the Fourteenth Amendment; and retaliation, in violation of the First Amendment.  *See* ECF 41-2, ¶ 6.  And, the five defendants are Lawrence F. Miller, Kristofer Davis, Lander Walley, Curtis

---

[1] ECF 8 is both a motion for leave to amend the Complaint and the First Amended Complaint.

Cornell, and Dustin Fignar.  ECF 41-2, ¶ 6.  In addition, the Court granted plaintiff's request to amend his Original Complaint, adding the four new defendants named in the FAC: David Sipes, Ronald Stotler,[2] Audrey Brown, and Robin Woolford.  *Id.* ¶¶ 2, 8.

Thereafter, the Court appointed pro bono counsel to represent plaintiff.  ECF 44; ECF 50. With defendants' consent (*see* ECF 51), counsel filed the Second Amended Complaint.  *See* ECF 53.  It contains little in the way of new factual allegations, and "expressly adopts and incorporates the procedural, factual, and legal statements and allegations," as well as the exhibits submitted with the Original Complaint and the First Amended Complaint.  *Id.* ¶ 1; *see* ECF 1-1; ECF 8-1; ECF 53-2 to ECF 53-11.[3]  I shall generally refer to the SAC, together with the material it has incorporated from the Original Complaint and the FAC, as the "Complaint."

The Second Amended Complaint reasserts plaintiff's three surviving federal constitutional claims, and lodges the claims against all nine current defendants.  *Id.* ¶¶ 2, 9-11.  These claims are now denominated as "Eighth Amendment – Use of Force" (Count I); "Fourteenth Amendment – Due Process" (Count II); and "First Amendment – Retaliation" (Count III).  *Id.* ¶¶ 9-11.  In addition, the SAC adds three new State law claims against all defendants: "Maryland Common Law – Negligence" (Count IV); "Maryland Common Law – Battery" (Count V); and "Maryland Declaration of Right [sic] – Article 25" (Count VI).  *Id.* ¶¶ 3, 12-22.  The SAC also contains "Count

---

[2] The Court's Order of July 19, 2021, and the Second Amended Complaint both refer to this defendant as "Ronald Stottler." *See, e.g.*, ECF 41, ¶ 8; ECF 53, ¶ 2. However, various exhibits make clear that the name is spelled "Stotler." *See, e.g.*, ECF 8-1 at 7; ECF 55-4. Plaintiff adopts this spelling in the Opposition. *See* ECF 58 at 1. Therefore, I will direct the Clerk to correct the docket.

[3] The exhibits included with the SAC are all documents previously docketed in this case: the two prior complaints and the Court's Memorandum Opinion (ECF 40) and Order (ECF 41-2) of July 19, 2021. *See* ECF 53-2 to ECF 53-11.

VII," titled "Punitive Damages."   ECF 53, ¶¶ 23-25.   All defendants have been sued in their individual and official capacities.  *Id*. ¶¶ 2, 3.

Defendants have filed a "Motion to Dismiss Plaintiff's Second Amended Complaint Or, In the Alternative, for Summary Judgment."  ECF 55.  The motion is supported by a memorandum (ECF 55-1) (collectively, the "Motion"), as well as exhibits.  ECF 55-3 to ECF 55-10.  The Motion does not challenge the three federal constitutional claims against the original five defendants, except to argue that the claims against defendants in their official capacities should be dismissed, pursuant to the Eleventh Amendment.  *See* ECF 55-1 at 2, 11-12.  However, the Motion urges the dismissal of all federal and State claims against the four new defendants (Sipes, Stotler, Brown, and Woolford).  *Id*. at 12-19.  And, the Motion argues that the three new State law claims must be dismissed as to all defendants, under the Maryland Tort Claims Act ("MTCA"), Md. Code (2021 Repl. Vol.), § 12-101 *et seq*. of the State Government Article ("S.G.").  ECF 55-1 at 19-22.

Plaintiff opposes the Motion.  ECF 58 (the "Opposition").  Defendants replied.  ECF 59 (the "Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion in part and deny it in part.

3

# I. Factual and Procedural Background[4]

## A. Incident of May 28, 2019, and Aftermath

On May 28, 2019, Kelly was an inmate at Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland, assigned to disciplinary segregation. ECF 1, ¶ 18. He is now confined at North Branch Correctional Institution ("NBCI"). *Id.* ¶ 3.

Plaintiff claims that on May 28, 2019, defendant Lander Walley, a "Correctional Officer Sergeant" at RCI (*id.* ¶ 8), came to his cell to escort him to a case management review hearing concerning plaintiff's assignment to segregation. *Id.* ¶¶ 3, 18. Kelly recalls that Walley opened the tray slot on the cell door, handcuffed Kelly behind his back, called for the cell door to be opened, and searched Kelly after he exited the cell. *Id.* ¶¶ 19, 20.

According to Kelly, during the escort to the review hearing, Walley engaged in what Kelly describes as a "very unprofessional, threaten[ing] and dangerous conversation" in which Walley called plaintiff a "rat (snitch)" and a "scared bitch." *Id.* ¶ 21. Kelly alleges that Walley "talked about how he would fuck up" Kelly's "bitch ass brother" because he called the prison on Kelly's behalf. *Id.* Further, Kelly alleges that Walley threatened to "get Plaintiff set-up" because Kelly had written complaints about Walley and other officers. *Id.*

Kelly acknowledges that he used profanity when addressing Walley, and that he told Walley he was going to complain about Walley's threats. *Id.* According to Kelly, Walley again threatened Kelly's brother with assault. *Id.* Upon arriving to the area where the segregation

---

[4] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). Where appropriate, I draw on the factual background provided in my Memorandum Opinion of July 19, 2021. *See* ECF 40 at 3-30.

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. But, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

reviews were conducted, Walley told Kelly "to have a seat" and also said: "'Don't move you little bitch.'"  ECF 1, ¶ 24.

Thereafter, defendants Kristofer Davis, Curtis Cornell, Dustin Fignar, and an officer named either Powers or Powell arrived, escorting other inmates.  *Id*. ¶ 25.  Kelly identifies Davis as a "Correctional Officer II" (*id*. ¶ 7); Cornell as a "Correctional Officer Sergeant" (*id*. ¶ 9); and Fignar as a "Correctional Officer II" (*id*. ¶ 10).  Kelly recalls that Cornell asked Walley what was going on, and speculates that Cornell must have heard Walley telling plaintiff not to move.  *Id*. ¶ 26.  Kelly alleges that Walley told Cornell nothing was going on.  *Id*.  After Fignar and Davis seated the inmates they were escorting, Kelly claims they began a verbal assault against him.  *Id*. ¶ 27.  Kelly states that Fignar said Kelly was "'all mouth'" and that he could not wait "'until those gangs get a hold of your coward ass.'"  *Id*. ¶ 28.  Kelly claims that Cornell also said that all Kelly does "'is run his big mouth,'" and accused him of being too scared to have a cellmate.  *Id*. ¶ 29.

According to Kelly, Walley then joined in, repeated that Kelly is a "rat and a coward," and made vulgar remarks about what he would make Kelly and his brother do.  *Id*. ¶ 30.  Kelly admits that he also engaged in the verbal exchange and made vulgar, threatening statements about Walley's children and his wife.  *Id*. ¶ 31.  According to Kelly, Walley responded that Kelly "'better watch his back at all times'" because "'cell doors do malfunction,'" especially the doors on cells housing members of the gang known as the Bloods.  *Id*. ¶ 33.  Kelly explains that because the Bloods threatened his life, he was on disciplinary segregation.  *Id*. ¶ 34.

Kelly was escorted into the review room by Davis, who remained in the room during the hearing.  *Id*. ¶ 39.  Kelly recalls that the review team consisted of a Case Management Staff

Member, Dwight Barnhart, a former defendant in this case;[5] Chelsea Finucane, a "mental health psychiatrist" at RCI (ECF 1, ¶ 61); an "Intel" officer; and another Case Management staff member who was conducting the hearing. *Id.* ¶ 39. During the hearing, Kelly asked why he had not been transferred to another prison yet and advised the review team that he was still being threatened by other inmates and officers. *Id.* Kelly claims he also told the review team about the verbal exchange that had just occurred. *Id.* In answer to plaintiff's questions, Barnhart advised that Kelly could not be transferred because he was viewed as a "serious disciplinary problem and officers daily viewed [his] 'daily behavior' as poor." *Id.* Kelly disputes Barnhart's assertions. *Id.*

Plaintiff also complained to the review team about officers not sending out his mail, and claimed the officers threw away his mail or gave it to gang members. *Id.* ¶ 40. Kelly specifically alleges that Fignar, Walley, Davis, and "Officer Quackenbush" are "guilty of mail fraud and tampering." *Id.* Kelly also asked the review team why he was still charged with assaulting inmate Dominic Frazier, when an investigator had concluded that Kelly was simply protecting himself from Frazier, a known member of the Bloods. *Id.* ¶ 41. Kelly noted that Fignar had dropped the rule violation for assault that was brought against Frazier, and had helped Frazier get released to home detention. *Id.*

Kelly recalls that he provided the review team with dates and times of incidents to support his claims. They include the following, *id.* ¶ 42:[6]

> Kelly claims that in August 2018 he was attacked by members of a gang known
> as the Black Guerrilla Family ("BGF"), and that they had advised him they were

---

[5] I include Kelly's allegations against former defendants in this case, including Dwight Barnhart, Kellie Boward, Casey Campbell, and Wayne Hill, because these allegations are part of the Complaint. But, I note that I granted summary judgment in favor of these former defendants in my decision of July 19, 2021. *See* ECF 40 at 43-61.

[6] I have used block form for convenience, but the list is not a quote from the suit.

hired by Fignar and "Officer Reel" to assault him so he would close his "big mouth."

On March 25, 2019, at 10:56 a.m., Kelly gave a mental health nurse a request form stating he was in danger from both officers and inmates.

On March 29, 2019, at 10:00 a.m., Officer Reel came to Kelly's cell door laughing about the false infraction he had issued against Kelly, stating: "'I can't wait to get my BGF . . . on that ass again.'"

On April 4, 2019, Kelly wrote to RCI Warden Casey M. Campbell, a former defendant in this case, regarding gang members and Officers Fignar and Davis.

On April 5, 2019, at 10:10 p.m., Kelly spoke to an investigator about the complaints he had filed regarding "dirty officers." Kelly's offer to take a polygraph test was declined by the investigator.

On April 8, 2019, Davis and Fignar called Kelly a rat and told a BGF member working on the tier that Kelly had filed a complaint about BGF members playing with Kelly's food.

On April 20, 2019, at 11:25 p.m., an "Officer McVey" came to Kelly's cell door and warned out loud that Kelly should be careful about writing everyone up.

On April 23, 2019, at 7:10 a.m., Fignar called Kelly a "'rat'" and a "'coward'" and told other inmates that Kelly was "'scared to come off of lock-up.'" Fignar then threatened that officers would assault Kelly again like they had the year before.

On May 11, 2019, at 7:12 p.m., an officer threw Kelly's requests for administrative remedy procedure ("ARP") in the trash.[7]

On May 21, 2019, at 4:25 p.m., Kelly gave "Officer Moore" a written complaint to be placed in the in-house mail for the Warden.

On May 22, 2019, at 10:22 a.m., Cornell came to Kelly's cell and said, "'You still alive[?]'"

On May 26, 2019, at 11:40 p.m., Officer McVey called Kelly a "scared bitch," and said he couldn't wait for Kelly to get payback for writing officers up.

---

[7] The Maryland Department of Public Safety and Correctional Services has made an "administrative remedy procedure" available to Maryland State prisoners for "inmate complaint resolution." Code of Maryland Regulations 12.07.01.01B(1) (defining ARP).

Kelly claims that Davis interrupted Kelly's presentation and asked if the review team was done with Kelly. ECF 1, ¶ 43. When Davis was advised that the team was "finished," Davis began to escort Kelly from the room. *Id.* Kelly claims the review team's dismissal of the events he was recounting amounted to deliberate indifference to his need for protective custody. *Id.* Kelly particularly faults Commissioner of Correction Wayne Hill, a former defendant in this case; Warden Campbell; and Barnhart for ignoring the credible information regarding the threats Kelly had received, and claims they also ignored repeated recommendations of RCI's own Investigative Division, which stated that Kelly should be transferred to another prison. *Id.*

Prior to leaving the segregation review hearing, Kelly asked if he could get a phone call, but claims Davis denied his request because Kelly had a sign on the window of his cell door. *Id.* ¶ 44. Kelly states that it was merely a small piece of paper, *id.*, which Walley had already made him remove. *Id.* Plaintiff asserted that because his cell was brought into compliance, he should be allowed to receive the phone call. *Id.* According to Kelly, Barnhart observed that if Kelly would stop being a daily behavior problem, he could get a phone call. *Id.* Kelly then asked for an ARP form. *Id.* As Davis took Kelly by the arm to escort him out of the hearing, Kelly admits that he looked at Barnhart and said: "'All of you can suck my dick.'" *Id.* ¶ 45.

According to Kelly, when he and Davis exited the hearing, Davis used a racial slur. *Id.* ¶ 46. Davis also told Walley, Fignar, and Cornell what had occurred at the hearing and advised that Kelly was keeping a log of his interactions with officers. *Id.* ¶ 48. Kelly claims that as he was being escorted back to his cell by Cornell and Davis, Cornell demanded to know where Kelly was "'hiding those snitch papers at.'" *Id.* ¶ 49. Kelly asserts that it was clear that the officers were interested in obtaining his "Data Log," where he documented various occurrences, but claims that because he had sent a copy of the log to his brother, he was not worried about the officers finding

it.  ECF 1, ¶ 49.  When they arrived at Kelly's cell, Davis and Cornell entered the cell to search it and began tossing Kelly's belongings all over the cell.  *Id.* ¶ 50.  In plaintiff's view, this conduct was not related to "institutional security."  *Id.*

Kelly states that during the search of his cell, he was permitted to go inside the cell and stand by the toilet, trying to keep a distance from Davis and Cornell while they searched.  *Id.* ¶ 51. According to Kelly, Walley and Fignar asked where the "rat papers" were, and Walley, Fignar, and Officer Powell or Powers stood in the doorway of the cell to block the view of other inmates on the tier.  *Id.*  Kelly claims that when Davis and Cornell could not find the log and were not successful in upsetting Kelly, Cornell falsely claimed that he saw Kelly kick Davis.  *Id.* ¶ 52.  In reality, according to Kelly, he merely kicked or stomped a folder, which did not even move.  *Id.* Cornell told Kelly: "I seen you kick Davis."  *Id.*  Kelly responded that he had not done so.  *Id.* Davis then punched Kelly in the face and mouth, smashed Kelly's face into the cell wall, and broke Kelly's two front teeth, which became lodged in Kelly's lower lip.  *Id.* ¶ 53.  Further, plaintiff claims that Davis put him into a "choke hold" and took him to the floor as Davis continued to punch Kelly in the head with a closed fist, reopening an old wound on the side of Kelly's head. *Id.*  Kelly thought the officers were going to kill him.  *Id.*

According to Kelly, he remained handcuffed behind his back during the assault, and he fought to remain conscious while Davis's arm was around his neck.  *Id.* ¶ 54.  Kelly asserts that he was having difficulty breathing during the assault, but managed to scream when he maneuvered his lower body out of the "awkward" and painful position it was in.  *Id.* ¶ 55.  After Kelly screamed, he claims Walley told Davis to stop, and Walley entered the cell to pull Davis off of Kelly.  *Id.*  In response, Davis stood up and began kicking Kelly in the ribs, back, and thigh as Kelly tried to "ball-up and use the toilet for protection."  *Id.*  Kelly continued to scream in order to alert other

inmates on the tier as to what was happening, and he claims that, in response to his screams, Davis stomped on plaintiff's legs and kicked him a few more times.  ECF 1, ¶ 55.

Plaintiff alleges that he began making statements loud enough for other inmates to hear that Davis had "chipped" Kelly's teeth and that Kelly was still handcuffed behind his back.  *Id*. ¶ 56.  Kelly claims that Davis told the other officers that they should say that Kelly had head-butted Davis.  *Id*.  Kelly recalls Davis smacking his own forehead with the palm of his hand to bolster the false report.  *Id*.  Moreover, he claims the officers tried to avoid any surveillance cameras.  *Id*.

Kelly alleges that Cornell helped him to his feet, used boxes that had been tossed around in the cell to wipe Kelly's bleeding mouth, and told Kelly to put on his tennis shoes.  *Id*. ¶ 57.  As Kelly put his shoes on, Fignar noticed that Kelly had urinated on himself.  *Id*.  Cornell then used a wet t-shirt to wipe Kelly's face again because his wounds continued to bleed.  *Id*.  According to Kelly, a conversation ensued in which the officers who were present offered to "call it even" and suggested that Kelly should simply claim he had a seizure.  *Id.* ¶ 58.  But, Davis kept telling the officers to say that Kelly had head-butted him.  *Id*.  Kelly told Davis to stop lying and pointed out that "only a fool would attack five officer [sic] while handcuffed behind his back."  *Id*.  Kelly claims that Davis continued to ask the other officers to support the false story that Kelly attacked him.  *Id*.

Although Kelly is not certain when Powers (or Powell) left his cell, he claims the officer was present during the beating and encouraged it.  *Id.* ¶ 57.  And, the officer allegedly acted as "a human shield" to block visibility into the cell.  *Id*.  Moreover, he claims that Davis and Cornell destroyed most of his legal papers and clothes.  *Id*.

As Kelly was being escorted off the tier, he proceeded past the Lieutenant's office where segregation reviews were still being held.  *Id*. ¶ 59.  Kelly kicked the door and screamed for the

10

Lieutenant to come out to see his injuries.  ECF 1, ¶ 59.  Kelly explains he wanted to ensure that everyone in the office could see that he had been beaten and that there were no marks on Davis. *Id*.  He recalls an officer emerging from the control station to ask what was going on and why Kelly was limping.  *Id*. ¶ 60.  Davis and Walley responded that Kelly had punched Davis and had to be restrained, while Cornell stated that Kelly had kicked Davis.  *Id*.

Kelly then alleges that after he kicked the door, an officer came out of the office, and plaintiff began yelling that he had been assaulted.  *Id*. ¶ 61.  Kelly claims that Fignar grabbed the handcuffs on Kelly's wrists and pushed his arms in the air toward his head while Cornell kicked Kelly's feet out from underneath him, causing him to fall to the floor.  *Id*.  Kelly cried out to Finucane, who was still inside the office conducting reviews, but she simply looked away.  *Id*.  Cornell and Fignar then grabbed Kelly's forearms near his wrists and pulled him to his feet and began to drag Kelly to a transport van to take him to medical.  *Id*. ¶ 62.

Plaintiff states that, after they arrived outside, Fignar had to return inside to retrieve the keys to the van, leaving Kelly alone with Cornell.  *Id*.  As they waited for Fignar to return, Kelly claims that his arms were again "violently snatched up behind his back sending severe pain throughout his body."  *Id*.  According to Kelly, it was the Intel Officer who had attended the segregation review hearing who had grabbed his arms.  *Id*.  After Kelly screamed, Cornell "waved off" the officer, who reluctantly let go.  *Id*. ¶ 62.  Kelly alleges that the Intel Officer repeatedly asked Cornell whether they needed his help to transport Kelly, in case he "gets out of line again." *Id*.  Cornell allegedly answered: "'No we got it.  He's (plaintiff) done had enough, he's (plaintiff) going to be a good little boy now.  Isn't that right boy. . . .'"  *Id*.  And, "like a good slave," plaintiff "did not dare spit out any blood from his bleeding mouth . . . ."  *Id.*

Fignar returned and gave the keys to the van to Cornell, who opened the side door and helped Kelly into the van. ECF 1, ¶ 63. Kelly claims that Cornell did not fasten Kelly's seatbelt or take any other safety precautions to ensure that Kelly would not be injured during the ride to medical. *Id*. Kelly describes the 30 to 40 seconds it took to get to the medical building as a "ride from hell." *Id*. According to Kelly, Fignar began telling him that he would be killed by gang members once he was transferred to NBCI; that Fignar wished he could witness Kelly getting stabbed; and that Kelly was going to get a "street charge" for assaulting Davis, adding that "no n***er is going to be found not guilty in our county." *Id*.

Once the van reached the medical unit, Fignar exited the van and Cornell took Kelly out of the van to escort him inside. *Id*. ¶ 65. Kelly states he could no longer swallow the blood in his mouth and spit it out on the pavement. *Id*. Fignar opened the door to the building and Cornell escorted Kelly inside. *Id*.

At the medical unit, plaintiff was seen by Nurse Kellie Boward, a former defendant in this case. *Id*. ¶ 66. He reported that he had been beaten by Davis, that his teeth were broken, and that he feared he had sustained internal injuries from the beating by Davis and the force used against him by Fignar and Cornell. *Id*.

Kelly claims that Boward "sadistically refused to examine him," despite seeing his bleeding mouth, the cut over his right eye, his leg was swollen, and he was limping. *Id*. ¶ 66. According to Kelly, Boward simply "crossed her arms over her chest" and announced that Kelly was "'fine.'" *Id*. Boward's report of the incident of May 28, 2019, acknowledges only that Kelly had a chip to his right front tooth and a small red mark inside his lower lip. *Id*. ¶ 69. Kelly also claims that Boward told Cornell and Fignar not to allow Kelly to see a dentist because it "'would

prove he had injuries'"; asked if Davis was okay; and remarked to Kelly: "I bet you won't get away with hitting a staff member this time.'"  ECF 1, ¶ 67.

To explain that last assertion, Kelly recounts that in December 2018, he had a seizure and unintentionally struck Boward and another nurse.  *Id*. ¶ 68.  He states that despite the circumstances, Boward had insisted that Kelly be charged with assaulting staff.  *Id*.  However, after an investigation into the incident, Kelly was not charged.  *Id*.  Kelly surmises that Boward held a grudge against him because of the incident.  *Id*.

Following plaintiff's examination by Boward, he was photographed by "Officer Stegner-Youtzy." *Id*. ¶ 70.  Kelly maintains that Stegner-Youtzy refused to take photographs of Kelly in a manner that would show all of his injuries and that the angle of the facial photograph obscured the injury to his eye.  *Id*.; *see also id*. ¶ 72.  In addition, Kelly claims that he told Stegner-Youtzy and "Officer Boozel" that Davis had assaulted him and asked if his cell would be photographed.  *Id*. ¶ 72.  Although the officers assured Kelly that his cell would be photographed, he claims that no photographs were ever taken.  *Id*.  Moreover, Warden Campbell allegedly denied Kelly's public defender access to the cell, even though the lawyer was representing Kelly at the criminal trial on February 24, 2020.  *Id*.

Kelly was placed in an isolated "observation cell" he claims is used for mental health observation and for inmates who are being transported to lock-up or protective custody.  *Id.* ¶ 71.  He claims that he remained in this cell for eight days, and asserts that the cell was unsanitary, the plumbing was defective, and the cell was smeared with feces.  *Id*.  Further, he claims that he was not provided with a shower, a mattress, eating utensils or toilet paper.  *Id*.  According to Kelly, he had to use pieces of his jumpsuit for toilet paper; had to eat with his hands, which he could not wash because there was no soap, and the water in the toilet and from the sink was very hot.  *Id*.

Moreover, as a result of his injuries, Kelly claims that he could not "'truly eat'" due to severe soreness in his gums as well as loose teeth. ECF 1, ¶ 71. He began to lose weight. *Id*. Kelly adds that when nurses brought his seizure medicine to the cell, they would not talk to him, but one nurse disclosed that they were told not to treat his wounds or give him anything for pain. *Id*.

In Kelly's view, he was assigned to this cell because defendants were attempting to keep him from being seen by staff members who did not want to engage in the cover-up. *Id*. As discussed below, he states that he was not permitted to attend his disciplinary hearing for the infraction he received in connection with the events of May 28, 2019, and claims this was because his right eye was swollen and "pus ridden." *Id*. He also claims that, upon the request of Fignar, defendant Lawrence F. Miller, the "Acting Security Chief" at RCI, filed a false report in an effort to keep Kelly from the hearing. *Id*.; *see also* ECF 1-1 at 30 (May 31, 2019, Miller Memo).

Plaintiff states that the mental health nurse, Finucane, "wanted nothing to do with Plaintiff and his situation." ECF 1, ¶ 71. But, she came to the isolation cell at the request of Warden Campbell "to declare" plaintiff as "delusional and crazy." *Id*. He claims Finucane lied to help Fignar, and told plaintiff that "what was going on with [him] was above her pay grade." *Id*. Kelly claims that Finucane later repeated everything he told her and helped Fignar "railroad[]" him on a false disciplinary charge. *Id*.[8] According to Kelly, a mental health pre-adjustment hearing assessment was "read into the record," at the hearing related to this charge, but Kelly never received a copy of it, nor was he told what was read into the record. ECF 1, ¶ 71.

Kelly maintains that he was not "a security threat," as Miller had reported. *Id*. ¶ 73. Rather, defendants wanted to keep him "out of sight until his injuries healed." *Id*.; *see also* ECF 1-1 at 30.

---

[8] Although the Complaint is unclear, this appears to be a reference to a separate disciplinary proceeding held against plaintiff on April 3, 2019, regarding an alleged incident on March 22, 2019. *See* ECF 1, ¶ 71; ECF 1-1 at 7-9, 16-19 (hearing records).

Kelly states that no investigator came to see him until after his swollen eye had healed and then on that day, June 5, 2019, he was transferred to NBCI.  ECF 1, ¶ 73.  When Kelly arrived at NBCI, he was placed on staff alert status, but was removed from that status one and a half days later, because he claims a "Lt. Walter Iser" could not understand why he was kept at RCI for eight days after an alleged assault on a staff member.  *Id*.  Kelly claims that the usual practice when an inmate assaults a staff member is to transfer the inmate immediately to NBCI, which can sometimes take one or two days, but never eight days.  *Id*.

After Kelly arrived at NBCI, he received some dental care, but it only involved filing off the sharp edges on his teeth.  *Id*.  He claims the assault by Davis is the reason that he will soon have to have all of his teeth removed.  *Id*.

Further, Kelly contends that he continues to suffer physical, emotional, and mental health problems as a result of the assault and because he was falsely accused of assaulting Davis.  *Id*. ¶ 74.  And, Kelly alleges that he continues to suffer bleeding gums, toothaches, and headaches, and claims that he continues to pass blood with bowel movements and urination.  *Id*.  In addition, he claims that his right eye "tears" and occasionally excretes pus.  *Id*.  According to Kelly, he has not been given anything for pain and has been told by medical staff to buy his own medication for pain from the commissary.  *Id*.  A sick call nurse at NBCI told Kelly that the blood in his urine and with his bowel movements is simply a side effect of his seizure medication (Keppra and Dilantin), which Kelly disputes.  *Id*.

Although Kelly was found guilty of assaulting Davis during a disciplinary hearing, as discussed below, he was acquitted of criminal charges for the assault following a trial by jury "[o]n February 24, 2020," in the Circuit Court for Washington County, Case C-21-cr-19-000788.  *Id*. ¶ 83; *see also id*. ¶¶ 76, 82; ECF 1-1 at 37-41 (Application for Statement of Charges against Kelly).

Kelly recalls that during the criminal trial, none of the officers could remember what they wrote in their reports and statements. ECF 1, ¶ 75. In addition, he claims that Davis, Walley, Fignar, Boward, and Stegner-Youtzy presented contradictory testimony. *Id*. Further, plaintiff asserts that none of the inmates who were on the tier during the assault were interviewed as part of the investigation, no investigator viewed the security video surveillance, and no photographs were taken of his cell. *Id*.

Kelly claims that he informed staff at NBCI that there is a hit out on him. ECF 8, ¶ 3. He continues to refuse housing assignments, leading to his continued assignment to disciplinary segregation for doing so. *Id*. ¶ 4; *see also* ECF 8-1 at 15-19 (disciplinary proceedings).

### B. Kelly's Disciplinary Hearing

As noted, in addition to the criminal case that was brought against Kelly, he was subjected to institutional disciplinary proceedings and punishment in relation to the incident of May 28, 2019. *See* ECF 1, ¶¶ 71, 76; ECF 8, ¶¶ 1-14. The materials sometimes refer to this disciplinary proceeding as an "adjustment hearing" or "infraction hearing." *See, e.g.*, ECF 1-1 at 30; ECF 55-1 at 4.

The Complaint includes two "Notice[s] of Inmate Rule Violation" and two "Notice[s] of Inmate Disciplinary Hearing," all dated May 29, 2019. *See* ECF 1-1 at 24-29 (the notices). The first Notice of Inmate Rule Violation includes a report completed by Davis, describing what allegedly occurred when he and Walley escorted Kelly to his cell after the segregation review hearing. *Id*. at 24. Davis recalled that when they arrived at Kelly's cell, he and Walley noticed a sheet hanging from the ceiling, and entered the cell to correct the rules violation. *Id*. Davis stated that "Kelly ran into the cell and tried to kick" Davis, but missed, and then head-butted Davis. *Id*. Walley and Davis "grabbed inmate Kelly by his upper torso and took him to the floor to gain

control of him." *Id*. Cornell and Fignar entered the cell to escort Kelly to medical for evaluation. Davis recommended rule violation charges of "101," committing assault or battery on staff, and "410," demonstrating disrespect, insolence, or use of vulgar language. ECF 1-1 at 24.

The same day, a "Supervisor," identified as "Agent" "R. Pettit," reviewed Davis's report and approved scheduling a formal hearing for the proposed charges. *Id*. The supervisor also recommended administrative segregation pending the hearing. The notice indicates that the recommendation was approved by Officer Boozel, the "Shift Commander." *Id*.

The second Notice of Inmate Rule Violation includes a report completed by Cornell, offering his own account of the incident. *Id*. at 27. According to Cornell, he and Fignar responded to an incident involving Kelly and staff. *Id*. Kelly was already in handcuffs, and he and Fignar "took control of" Kelly "to escort him" to medical for evaluation. *Id*. During the escort, Kelly "suddenly jerked away from [their] grasps" and "kicked" the door to the Lieutenant's office, where segregation reviews were being conducted. *Id*. Cornell "immediately wrapped" his arms around Kelly's torso, while Fignar grasped Kelly's right arm. Cornell and Fignar took Kelly "to the floor" and were able to "regain control" of plaintiff. *Id*.

Kelly disputes the accuracy of Cornell's report, although this portion of the Complaint is difficult to follow. ECF 1, ¶ 60. As mentioned above, Kelly alleges that when he kicked the door of the Lieutenant's office following the incident in his cell and an officer emerged to ask what was going on, Davis and Wally responded that Kelly had punched Davis and had to be restrained, while Cornell stated that Kelly had kicked Davis. *Id*. Kelly hypothesizes that because Cornell contradicted the cover-up story that Davis had devised, Cornell's report was "altered to exclude [Cornell] from being present inside of Kelly's cell" during the assault. *Id*. As noted, Kelly alleges

that Cornell was, in fact, present in Kelly's cell during the incident.  *See* ECF 1, ¶¶ 51-58.  In Kelly's view, Cornell's report lends credence to Kelly's claim that the report is false.  *Id.* ¶ 60.

Kelly also quotes the Application for Statement of Charges in the criminal case against him, which described Cornell's report as stating that Walley and Davis entered Kelly's cell, and then Kelly ran into the cell "'[m]oments later.'"  *Id.* (quoting ECF 1-1 at 37) (alteration mine).[9] Kelly appears to contend that this report is at odds with Davis's report of the incident, which states that Cornell and Fignar entered Kelly's cell to escort him to medical.  ECF 1, ¶ 60; *see also* ECF 1-1 at 24 (Davis's report).  Kelly also disputes Cornell's assertion that plaintiff jerked away from the officers during the escort to medical in order to kick the Lieutenant's door.  ECF 1, ¶ 60.

In any event, Kelly recommended rule violation charges of "100," engaging in a disruptive act, and "116," possessing, misusing, damaging, or destroying security equipment.  ECF 1-1 at 27.  The "Shift Supervisor," "Agent" "M. Cutter," approved scheduling a formal hearing for Cornell's proposed charges.  *Id.*  As with Davis's report, Cutter recommended administrative segregation pending the hearing, which Shift Commander Boozel approved.  *Id.* at 28.

Each Notice of Inmate Rule Violation was accompanied by a Notice of Inmate Disciplinary Hearing.  *Id.* at 26, 29.  These documents notified Kelly that he had been served with a copy of a rule violation report; that a formal hearing would be scheduled; and informed plaintiff of his rights to present a case at the hearing, to request a representative, to call witnesses, and to offer evidence.  *Id.*  The spaces in these notices for "Service and Receipt of Notice" are blank.  *Id.*  Instead, each notice indicates that Kelly refused to sign for receipt, but did receive "a copy of the rule violation report and this Notice."  *Id.*  Each Notice of Inmate Disciplinary Hearing is signed, apparently by

---

[9] The "[m]oments later" language, although in the Application for Statement of Charges, does not actually appear in Cornell's report at ECF 1-1 at 27.

a correctional officer, although the signatures are not legible, together with a date of May 29, 2019, and a time of 4:00 p.m.  ECF 1-1 at 27.

Defendant Miller, the RCI "Acting Security Chief," prepared a "Memorandum" dated May 31, 2019, directed to the "Hearing Officer."  *Id*. at 30.  Miller asserted that Kelly "recently made multiple threats directed at staff at RCI," assaulted Davis, and "[r]eportedly . . . has feces smeared over his cell."  *Id*. at 30.  Therefore, Miller recommended that Kelly's "current adjustment hearings be conducted in absentia, to avoid an unnecessary confrontation," and for the safety of the hearing officer and RCI staff.  *Id*.[10]  The Complaint also includes an "Inmate Waiver of Appearance" dated May 31, 2019, and apparently prepared by Fignar.  *Id* at 31.  This document states: "Inmate Keith Kelly has been determined to be a threat to the operations and security of the institution.  Due to Inmate Kelly's [illegible] nature against staff he will be heard in absentia.  This is in attempt to avoid any further potential altercations or assaults."  *Id*.

As indicated, plaintiff alleges that, at the request of Fignar, Miller filed a false report in an effort to keep Kelly from attending the hearing.  ECF 1, ¶ 71; ECF 8, ¶¶ 1, 6.  And, he states that "R.C.I. staff used false reports to keep plaintiff out of the hearing and from serving plaintiff with the violation reports."  ECF 8, ¶ 6.  Kelly maintains that, in actuality, he was not permitted to attend his hearing because his right eye was swollen and "pus ridden."  ECF 1, ¶ 71.  Moreover, he alleges that he was never informed of the hearing, and that at the hearing, he was "found guilty based off of the same false reports" filed by Davis, Walley, Fignar, and Cornell.  ECF 8, ¶ 1.

---

[10] The Reply (ECF 59 at 4) cites Code of Maryland Regulations 12.03.01.13.B(2), which provides: "The hearing officer may determine that the defendant waived an appearance before the hearing officer and participation in the disciplinary proceeding if the defendant . . . Poses a threat to the security of the facility or the safety of an inmate, staff, or an individual . . . ."

Plaintiff identifies defendant David Sipes as the "Hearing Officer" who presided over this hearing. ECF 8, ¶ 11. He describes the hearing as unfair, and as lacking a fair and impartial decisionmaker. *Id.* ¶¶ 6, 7.

The Complaint includes an "Inmate Hearing Record" regarding Kelly's hearing, which appears to have been held on May 31, 2019, on all four charges. ECF 1-1 at 32-36 (Inmate Hearing Record).[11] Sipes was the "Hearing Officer of Record." *Id.* Kelly "was heard in absentia being he is a threat to security," but was listed as having received a copy of the rule violation "notice"; as declining representation, witnesses, or evidence; and as pleading not guilty to each charge. *Id.* at 33-34. Sipes found "the violations credible and reliable," and found Kelly guilty of violating rules 101, 116, and 410, but not 100. *Id.* at 34-35. He also noted that Kelly's "[A]djustment History" was "Poor." *Id.* at 35.

In the Complaint, Kelly states that as a result of the guilty finding at the institutional level, he lost 250 days of good conduct credit, was sentenced to 430 days of disciplinary segregation, and was transferred to NBCI. ECF 8, ¶ 3. However, the Inmate Hearing Record appears to reflect a sentence of 250 days of disciplinary segregation (250 days for the Rule 101 violation and 180 days for the Rule 116 violation, to be served concurrently), as well as the loss of 250 days of good conduct credit. ECF 1-1 at 35. The Inmate Hearing Record reflects that Kelly received a copy of the document on May 31, 2019, but that he was "unable to sign due to security reasons." *Id.* at 32.

Kelly alleges that defendant Ronald Stotler was an "Agent" at RCI who reviewed Sipes's decision from the disciplinary hearing after plaintiff appealed. ECF 8, ¶ 12. A separate "Inmate Hearing Record" included with the Complaint reflects that Stotler, acting as the Warden's

---

[11] The Motion states that this hearing was held on May 29, 2019 (ECF 55-1 at 4), but the materials indicate that it was held on May 31, 2019. *See* ECF 1-1 at 30, 34.

designee, concurred with Sipes and affirmed his sanctions on June 25, 2019.  ECF 8-1 at 5-7.  The

record also indicates that Kelly received a copy of the document on June 26, 2019.  ECF 1-1 at 5.

Kelly signed and wrote: "Never seen these papers until today, never was given any charge papers,

never went to a hearing.  I'm only signing this to receive copies of this illegal hearing that I know

nothing of."  *Id*.

Documents included with the Complaint indicate that on July 9, 2019, Kelly submitted an

ARP to Warden Campbell, complaining about his absence from his disciplinary hearing and the

alleged assault by RCI staff.  ECF 1-1 at 45-54.  It was rejected by Campbell on July 15, 2019.  *Id*.

at 54.  Regarding the hearing, Campbell wrote: "The Chief of Security approved for an absentia

form to be submitted for your adjustment hearing due to you being deemed a threat to the security

of the institution."  *Id*.  As to the assault, Campbell informed Kelly that it was ineligible for

investigation through the ARP process because it was being investigated by the Intelligence and

Investigation Division of the Maryland Department of Public Safety and Correctional Services

("DPSCS"), citing the Code of Maryland Regulations ("COMAR") 12.02.28.11.B(1)(h).  *Id*.

Kelly then appealed the Warden's response to the Commissioner of Correction.  *Id*. at 42-

44.  The appeal was denied on July 26, 2019.  *Id*. at 42.  Regarding the hearing, the denial cited

COMAR 12.02.28.04.B(3), which provides: "An inmate may not use the ARP to resolve a

complaint concerning . . . Inmate disciplinary hearing procedures and decisions . . . ."

Kelly also appealed the outcome of his disciplinary hearing to the Inmate Grievance Office

("IGO") of DPSCS.  ECF 8, ¶¶ 9, 13-14; ECF 8-1 at 8-9 (dismissal of appeal dated Feb. 18, 2020).

This appeal appears to have been filed on July 8, 2019.  *See* ECF 8-1 at 8, 11.  Kelly identifies

defendant Robin Woolford as the Deputy Director of the IGO, who was "assigned to make the

final ruling on plaintiff's grievance."  ECF 8, ¶ 14.  And, he identifies defendant Audrey Brown

as an "Administrative Officer" of the IGO, who was "assigned to handled [sic] plaintiff's grievance." ECF 8, ¶ 13.[12]

Woolford dismissed Kelly's appeal in a letter dated February 18, 2020.  ECF 8-1 at 8-9.  Woolford explained that he "gave careful consideration to the issue [Kelly] raised," but decided that Kelly's grievance was "wholly lacking in merit."  *Id*. at 8.  Citing COMAR 12.07.01.08(B), which establishes the standard of review for IGO grievances, Woolford stated, *id*. at 8:

> Because you have failed to effectively challenge the sufficiency of the evidence underlying the finding of guilt, or any interpretations of law, or compliance with procedural requirements or constitutional principles of due process, or the sanctions imposed, I conclude that you failed to state a claim your grievance upon which administrative relief can and should be granted.

**C. History of Kelly's Claims; Allegations in Second Amended Complaint**

The Court's Memorandum Opinion (ECF 40) and Order (ECF 41-2) of July 19, 2021, construed Kelly's pro se Original Complaint and First Amended Complaint as lodging claims for use of excessive force, in violation of the Eighth Amendment; denial of medical care, in violation of the Eighth Amendment; failure to protect, in violation of the Eighth Amendment; denial of procedural due process, in violation of the Fourteenth Amendment; retaliation, in violation of the First Amendment; and an unlawful cell search, in violation of the Fourth Amendment.  *See* ECF 1, ¶¶ 78-98; ECF 8, ¶¶ 15-16; ECF 40 at 43-59.  Boward moved for dismissal or summary judgment.  ECF 23.  And, all the remaining original defendants moved jointly to dismiss or for summary judgment.  ECF 34.

---

[12] The Complaint is unclear as to any specific actions of Brown. The Complaint includes a letter from Brown to Kelly dated August 12, 2019, dismissing an IGO appeal filed by Kelly for failure to provide requested documentation. ECF 8-1 at 10. But, this appears to be a different appeal, concerning a disciplinary hearing on April 3, 2019. *See id*.

In my ruling of July 19, 2021, I construed the defense motions as motions for summary judgment, granted Boward's motion, and granted the other defendants' motion, in part.   In particular, the Court dismissed the suit as to defendants Boward, Frank B. Bishop, Campbell, Hill, Richard Roderick, Barnhart, and Megan Thrasher, and dismissed plaintiff's claims for denial of medical care, failure to protect, and unlawful search.   ECF 40 at 43-61; ECF 41-2, ¶¶ 5-6.   In addition, the Court found no § 1983 liability as to the supervisory defendants, Hill and Campbell. ECF 40 at 59-61.   However, as to defendants Cornell, Davis, Fignar, Walley, and Miller, the Court denied the motion with respect to plaintiff's claims for use of excessive force, violation of procedural due process, and retaliation.   *Id*. at 43-46, 56-59; ECF 41-2, ¶ 6.   In doing so, the Court analyzed plaintiff's use of force claim against Cornell, Davis, Fignar, and Walley for their actions in Kelly's cell (ECF 40 at 43-46); analyzed plaintiff's procedural due process claim with respect to "Miller's involvement in procuring an adjustment hearing in absentia" (*id*. at 57); and analyzed plaintiff's retaliation claim as to all remaining defendants.   *Id*. at 57-59.   The Court also denied defendants' qualified immunity arguments.   *Id*. at 61-68.

The Court's Order stated: "Summary judgment . . . is denied as to all remaining defendants on the Eighth Amendment claims of use of excessive force; Fourteenth Amendment claims of denial of due process; and the First Amendment claim of retaliation."   ECF 41-2, ¶ 6.   As mentioned, the Court also permitted plaintiff to add the four new defendants identified in the Second Amended Complaint: Sipes, Stotler, Brown, and Woolford.   *Id*. ¶¶ 2, 8.   However, because those defendants had not yet been served with the suit, the Court did not evaluate the viability of any claims against them.

The Second Amended Complaint, filed through appointed counsel, incorporated the procedural, factual, and legal statements and allegations in the Original Complaint and First Amended Complaint (*see* ECF 53, ¶ 1), and asserted as follows, *id*. ¶ 2:

> According to this Court's Memorandum Opinion and Order the remaining Defendants, in their individual and official capacities, include: (l) Lawrence F, Miller; (2) Kristofer Davis; (3) Lander Walley; (4) Curtis Cornell; (5) Dustin Fignar; (6) David Sipes; (7) Ronald Stottler; (8) Audrey Brown, and (9) Robin Woolford. The remaining claims against all Defendants include: (1) an Eighth Amendment claim of use of excessive force; (2) a Fourteenth Amendment claim of denial of due process; and (3) a First Amendment claim of retaliation.

Consistent with this characterization, the SAC restated the claims of use of force, due process, and retaliation, without alleging any new facts. ECF 53, ¶¶ 9-11. The SAC alleges that all defendants acted under color of law, jointly and in concert with one another, and asserts that each defendant had the duty and the opportunity to protect Kelly from the unlawful actions of other defendants, but failed to do so. *Id*. ¶ 7.

The Second Amended Complaint also lodges a common law negligence claim against all defendants. *Id*. ¶¶ 12-15. In particular, it asserts that defendants were negligent and careless by failing to exercise due care in their interactions with Kelly, including the use of force incident in Kelly's cell; failing to provide Kelly with a proper adjustment hearing, including by preventing him from attending; and failing properly to handle the ARPs filed by Kelly, including by transferring him to NBCI and discouraging him from accessing the procedure. *Id*. ¶ 13.

In addition, the SAC lodges a common law battery claim, apparently against all defendants, in relation to the use of force incident in Kelly's cell, alleging that defendants "intentionally touched Mr. Kelly, in an offensive and harmful way, without his consent." *Id*. ¶ 17. And, the SAC brings a claim against all defendants under Article 25 of the Maryland Declaration of Rights, alleging cruel and unusual punishment, including but not limited to the use of force in Kelly's cell.

ECF 53, ¶¶ 19-22.  The SAC asserts: "The actions of Defendants during the use of force in Mr. Kelly's cell, were conducted with ill will, recklessness, wantonness, oppressiveness, and/or in the reckless and willful disregard for the welfare and rights of Mr. Kelly, and Defendants were engaged with actual malice and intent to harm Mr. Kelly, thereby justifying an award of punitive damages."  *Id.* ¶ 24.

Additional facts are included in the Discussion, *infra*.

## II.  Standards of Review

### A. Summary Judgment

As noted, the Motion is styled as a "Motion to Dismiss Plaintiff's Second Amended Complaint Or, In the Alternative, for Summary Judgment."  ECF 55.  A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to

notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[13]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366 (3d ed. 2018). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

However, summary judgment is usually inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. de Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). But, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule

---

[13] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that . . . discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Financial*, 514 Fed. App'x 378 (4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit…is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an

adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted).

Plaintiff has not submitted a Rule 56(d) affidavit.  However, in the Opposition, plaintiff specifically requests that if there is not enough evidence in the record to determine the "role played" by defendants "in violating Plaintiff's procedural due process," then the Court should deny the Motion, "or hold determination on those aspects of the motion pending further discovery and consider this request and objection to be the functional equivalent of a Rule 56 affidavit."  ECF 58 at 7 n.3.  More broadly, it is evident that there are significant factual questions relevant to the resolution of plaintiff's claims, including the circumstances of the use of force incident on May 28, 2019; the conduct of the disciplinary proceedings against plaintiff; and whether defendants acted with malice or gross negligence, as discussed below.  Indeed, as noted, the Court previously denied summary judgment as to certain claims because of genuine disputes of material fact.  *See* ECF 40 at 43-46, 56-59.

Accordingly, I conclude that consideration of the Motion as one for summary judgment, without the benefit of discovery, would be premature.  As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask."  *McCray*, 741 F.3d at 483; *accord Putney*, 656 Fed. App'x at 639.  Therefore, I shall construe the Motion as a motion to dismiss.

### B. Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to challenge the court's subject matter jurisdiction with regard to the plaintiff's suit.  Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction.  *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).  However, a court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'"  *B.F. Perkins*, 166 F.3d at 647 (citation omitted).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge.  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *accord Hutton v. Nat'l Bd. of Exam'rs Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018). In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction."  *Kerns*, 585 F.3d at 192; accord *Clear Channel Outdoor, Inc. v. Mayor and City Council of Baltimore*, 22 F. Supp. 3d 519, 524 (D. Md. 2014).  In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction."  *Kerns*, 585 F.3d at 192. In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

The Motion argues that suit against defendants in their official capacities must be dismissed under Eleventh Amendment sovereign immunity. *See* ECF 55-1 at 11-12. Although the Motion does not explicitly invoke Rule 12(b)(1), the Eleventh Amendment argument is a facial challenge to the Court's subject matter jurisdiction.

The Fourth Circuit has reiterated that the defense of sovereign immunity is a jurisdictional bar, explaining that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc*., 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 417 (2018); *see also Cunningham v. Lester*, 990 F.3d 361,365 (4th Cir. 2021) (recognizing sovereign immunity as a jurisdictional limitation and describing it as "a weighty principle, foundational to our constitutional system"). Notably, "the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (citing *Hutto v. S.C. Ret. Sys*., 773 F.3d 536, 543 (4th Cir. 2014)).

### C. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A

Rule 12(b)(6) motion constitutes an assertion by a defendant that, even assuming that the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304-05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n

unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, ___ Fed. App'x ___, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting

*Edwards*, 178 F.3d at 243).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'"  *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).  *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).  The court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]"  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town*

*of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167.  Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.*  Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

And, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods*, 855 F.3d at 642; *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Applying these principles, I may consider all of the documents attached by plaintiff to his Original Complaint, First Amended Complaint, and Second Amended Complaint. *See* ECF 1-1; ECF 8-1; ECF 53-2 to ECF 53-11.[14]  Furthermore, many of the documents included with the Motion that relate to the disciplinary proceedings against plaintiff were already included with the Original Complaint or the First Amended Complaint, and therefore may be considered. *See* ECF 55-6 to ECF 55-9.  And, the "Notice of Claim Form" mailed by plaintiff to the Treasurer of the State of Maryland (the "Treasurer"), which is included with the Opposition (*see* ECF 55-10), may be considered because it is integral to plaintiff's Complaint, there is no dispute as to its authenticity, and plaintiff does not object to its consideration. *See* ECF 58 at 8.  However, the declarations of Sipes, Stotler, and Woolford, submitted with the Motion, may not be considered at the Rule 12(b)(6) stage. *See* ECF 55-3 to ECF 55-5.

---

[14] As noted, the Second Amended Complaint explicitly incorporates the exhibits included with the first two complaints. *See* ECF 53, ¶ 1. And, the exhibits included with the SAC are documents from this case, namely the two prior complaints and the Court's Memorandum Opinion (ECF 40) and Order (ECF 41-2) of July 19, 2021. *See* ECF 53-2 to ECF 53-11.

### D. Section 1983 Generally

Plaintiff's federal law claims are premised on 42 U.S.C. § 1983.  Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (*quoting Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48, (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).  "The first step in any such claim is to pinpoint the specific right that has been infringed."  *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is

36

identical.'" *Davison*, 912 F.3d at 679 (*quoting Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982).  A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (*quoting United States v. Classic*, 313 U.S. 299, 326, (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

To pursue a § 1983 claim against defendants in their individual capacities, plaintiff must show that defendants "acted personally in the deprivation of the plaintiffs' rights."  *Vinnedge v. Gibbs*, 550 F. 2d 926, 928 (4th Cir. 1977); *see also Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (same); *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (same).  It is insufficient to show that subordinates of a sued official deprived plaintiff of his rights, as the doctrine of respondeat superior does not apply to § 1983 cases.  *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).  If plaintiff has not alleged any personal connection between a defendant and a denial of constitutional rights, the claim against that defendant must fail.  *Vinnedge*, 550 F. 2d at 928.

### III.  Discussion

### A. Overview

The Motion makes several arguments.  First, defendants argue that all claims against them in their official capacities must be dismissed under the Eleventh Amendment.  ECF 55-1 at 11-12. Second, they contend that all federal and State claims against the four new defendants should be

dismissed for failure to state a claim.  ECF 55-1 at 12-19.  Third, the Motion maintains that the three new State law claims must be dismissed as to all defendants, under the Maryland Tort Claims Act, for failure to provide notice to the Treasurer, and failure to adequately allege malice or gross negligence.  *Id*. at 19-22.

I note an initial matter.  As discussed, the Second Amended Complaint explicitly construed the Court's decision of July 14, 2021, to have left intact plaintiff's use of force, due process, and retaliation claims against *all* defendants.  ECF 53, ¶ 2.  Accordingly, the SAC reasserted these claims against all defendants.  *Id*. ¶¶ 2, 9-11.  However, in my earlier denial of summary judgment regarding the use of force in Kelly's cell (ECF 40, ECF 41), I specifically discussed the actions of Cornell, Fignar, Davis, and Walley.  ECF 40 at 46.  And, in my earlier denial of summary judgment as to procedural due process, I specifically discussed the role of Miller.  *Id*. at 57.  It is not clear that the facts as now alleged in the SAC support a use of force claim against Miller, or a due process claim against Cornell, Fignar, Davis, and Walley.  The Court also allowed the retaliation claim to proceed.  But, I did not specifically discuss any defendants.  *See id*. at 57-59.

The Motion argues that plaintiff has failed to state a claim as to the new defendants (Sipes, Stotler, Brown, and Woolford).  ECF 55-1 at 12-19.  Although the Second Amended Complaint expressly advances three federal law claims against *all* defendants, the Motion does not address whether plaintiff has adequately stated his federal law claims against any of the remaining original defendants.  *See id*. at 2.  Accordingly, at this juncture, the Court will not consider the viability of plaintiff's use of force, procedural due process, and retaliation claims against Cornell, Fignar, Davis, Walley, or Miller.  In other words, those claims shall proceed.

Likewise, the Second Amended Complaint lodges three State law claims against all defendants.  ECF 53, ¶¶ 3, 15, 18, 22.  Beyond the MTCA arguments, the Motion does not contend

that the State law claims should be dismissed against any of the original defendants.  Therefore, I do not evaluate the general viability of the State law claims against the original defendants.

### B.  Eleventh Amendment

As to the issue of Eleventh Amendment immunity, the Motion argues: "Defendants are . . .  immune from suit in federal court in their official capacity and the claims against them must be dismissed."  ECF 55-1 at 12.  Plaintiff concedes this point, agreeing that only his individual capacity claims may proceed.  ECF 58 at 3. He states, *id.*: "While claims brought by individuals in federal court against the State, or against state employees acting in their <u>official</u> capacities, are barred under the Eleventh Amendment, claims brought against state employees acting in their <u>individual</u> capacities are not such barred [sic]."  (Emphases in original.)

Accordingly, plaintiff's claims against the defendants in their official capacities will be dismissed.  I turn to the contested issues.

### C. Failure to State a Claim Against The New Defendants

The Motion contends that the SAC fails to state a claim against the four new defendants: Sipes, Stotler, Brown, and Woolford.  ECF 55-1 at 12-19.  Indeed, it is difficult to discern any basis in the SAC for most of plaintiff's claims against the four new defendants.  In particular, there is no allegation that any of these defendants were involved in the use of force incident in Kelly's cell on May 28, 2019, and that incident is the basis for plaintiff's Eighth Amendment, battery, and Article 25 claims.[15]

The Opposition argues only that plaintiff has adequately stated a Fourteenth Amendment procedural due process claim against the four new defendants.  ECF 58 at 7 ("In sum, Plaintiff has

---

[15] Article 25 of the Maryland Declaration of Rights is interpreted *in pari materia* with the Eighth Amendment. *See Evans v. State*, 396 Md. 256, 327, 914 A.2d 25, 67 (2006), *cert. denied*, 552 U.S. 835 (2007); *Walker v. State*, 53 Md. App. 171, 183, 452 A.2d 1234, 1240 (1982).

sufficiently alleged that Defendants Sipes, Stotler, Woolford, and Brown played a crucial role in the chain of the violation of Plaintiff's procedural due process rights under the Fourteenth Amendment."); *see* ECF 58 at 3-8.  In other words, the Opposition does not respond to the Motion's contention that the Complaint has not stated any other claims against the four new defendants.  *See id*.  Instead, it focuses exclusively on the procedural due process issue.

Judges in this district have held that, by failing to respond to an argument made in a motion to dismiss, a plaintiff abandons his claim.  *See, e.g.*, *Kitchings v. Shelton*, PWG-17-882, 2018 WL 398285, at *6 (D. Md. Jan. 12, 2018) ("When a defendant's motion to dismiss a complaint states specific deficiencies that warrant dismissal, and presents supporting legal arguments, it is the plaintiff's obligation to respond substantively to address them.  Failure to respond to the defendants [sic] arguments constitutes abandonment of those claims."); *Stenlund v. Marriot Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016) ("In failing to respond to [defendant's] argument, Plaintiff concedes the point."); *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (same).  Accordingly, plaintiff has conceded that he has failed to state a claim against Sipes, Stotler, Woolford, and Brown, except with respect to the procedural due process claim.

I turn to the substance of plaintiff's procedural due process claim against the four new defendants.

Prisoners retain rights under the Due Process Clause of the Fourteenth Amendment.  But, prison disciplinary proceedings are not part of a criminal prosecution and a prisoner is not entitled to the full array of rights due a defendant in a criminal proceeding.  *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citing *Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)).

Nevertheless, in prison disciplinary proceedings, where an inmate faces the possible loss of diminution credits, he is entitled to certain due process protections.  These include: (1) advance

written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing where he is afforded the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker. *See Wolff*, 418 U.S. at 564-66, 592; *see also Tyler v. Hooks*, 945 F.3d 159, 168 (4th Cir. 2019); *Lennear v. Wilson*, 937 F.3d 257, 268 (4th Cir. 2019); *Williamson*, 912 F.3d at 176-77; *Dilworth v. Adams*, 841 F.3d 246, 253 (4th Cir. 2016).

However, there is no constitutional right to confront and cross-examine witnesses or to retain a lawyer or have one appointed. *See Baxter v. Palmigiano*, 425 U.S. 308, 322 (1976); *Brown v. Braxton*, 373 F.3d 501, 504-05 (4th Cir. 2004). As long as the hearing officer's decision contains a written statement of the evidence relied upon, due process is satisfied. *See Baxter*, 425 U.S. at 322, n.5. Moreover, substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence." *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985); *Tyler*, 945 F.3d at 171 (stating that "the 'some evidence' standard is extremely broad in scope and presents a very low burden for prison officials to meet").

Much of the parties' dispute centers on whether these new defendants were personally involved in any alleged violations of plaintiff's rights. As mentioned, it is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane*, 355 F.3d at 782 (no respondeat superior liability under § 1983).

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *See Williamson*, 912 F.3d at 171; *Wright*, 766 F.2d at 850; *Vinnedge*, 550 F.2d at 928. "Importantly, mere knowledge of such a deprivation does not suffice." *Williamson*,

41

912 F.3d at 171.   Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"   *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

*Wright*, 766 F.3d 841, and *Williamson*, 912 F.3d 154, are both instructive here, although neither is precisely on all fours.   In *Wright*, the plaintiff, an inmate at the Maryland Penitentiary, brought a variety of claims.   766 F.3d at 843-44.   Of relevance, he was sentenced to segregation for an infraction at an adjustment hearing, at which his request for representation was denied.   *Id*. at 844.   He appealed the sentence to the warden, a defendant, who denied the appeal.   *Id*.   Wright claimed the denial of representation at the hearing violated his due process rights.   *Id*.   He also claimed that the conditions of segregation were so poor that they constituted cruel and unusual punishment.   *Id*.   While in segregation, Wright sent the warden a letter "complaining that he was denied counsel and protesting the conditions in the segregation unit."   *Id*. at 850.   The warden denied the appeal.   *Id*. at 844.   The district court granted summary judgment to the warden, finding

there was insufficient personal involvement on the warden's part to justify liability under § 1983 for either claim. *Id*. at 849.

The Fourth Circuit affirmed the district court as to the due process claim, but reversed as to the cruel and unusual punishment claim. *Id*. at 850. It noted that the warden "was not present at the adjustment team hearing and was not involved in the conduct of the hearing. His sole involvement was to review the merits of Wright's assignment to segregation." *Id*. Wright's letter did "not establish personal involvement in the adjustment hearing, but rather a notification of alleged harm done by others. Such notice can only facilitate personal involvement in a deprivation of rights where the harm continues over a period of time." *Id*. Conversely, Wright had mailed the warden a letter detailing the conditions in segregation while he was incarcerated there, and this constituted "notification of a continuing problem which may have been within [the warden's] power to remedy," especially given the warden's "broad authority over the prison." *Id*.

*Williamson* concerned a § 1983 due process suit by a South Carolina plaintiff who was held in solitary confinement for three and a half years while in pretrial detention. 912 F.3d at 159. This detention occurred pursuant to the state's "safekeeper program," which permitted the transfer of a pretrial detainee to the state prison system, with authorization from the governor, if the detainee was considered a high risk of escape or violence. *Id*. at 161. The plaintiff asserted, among various claims, that this transfer violated his Fourteenth Amendment due process rights, because it occurred without notice or a hearing. *Id*. at 165. As defendants, he named the director of the state department of corrections; the sheriff of the county where he was originally detained; the administrator of the county jail; and a state prosecutor. *Id*. at 159-60. The district court granted summary judgment in favor of all defendants. *Id*. at 159.

The district court had not considered whether the defendants were personally responsible for the alleged constitutional deprivations, as required by § 1983, but the Fourth Circuit did so. *Id*. at 171-73.  It concluded that plaintiff had adequately demonstrated the personal involvement of the department director and the county sheriff, because they "played key roles in securing and maintaining Williamson's confinement under the safekeeper program" by periodically recommending that the governor authorize his safekeeper status. *Id*. at 171.  On the other hand, plaintiff failed to demonstrate personal involvement for the jail administrator and the prosecutor. *Id*. at 172-73.  Plaintiff alleged that the administrator, along with the sheriff, "failed to provide [him] with notice or a hearing regarding his transfer from [county] custody to safekeeper status." *Id*. at 172.  However, this allegation did not appear to be based on any knowledge by plaintiff as to relevant procedure. *Id*.  Meanwhile, the administrator had testified that she had no involvement in plaintiff's transfer, and there was no evidence to contradict her. *Id*.  As for the prosecutor, although he knew of the conduct by the plaintiff that led to his safekeeper status, he was not involved in securing the transfer except in very minor ways. *Id*.  Thus, the Fourth Circuit affirmed summary judgment in favor of the administrator and the prosecutor. *Id*. at 172-73.  But, on other grounds, it vacated and remanded as to the director and the sheriff. *Id*. at 189-90.

Here, as discussed, plaintiff alleges that his disciplinary hearing on May 31, 2019, was unconstitutional, premised on false reports, and lacked a fair and impartial decisionmaker.  ECF 8, ¶¶ 1-2, 6-7.  Specifically, he alleges that RCI staff—particularly Miller, at the request of Fignar—generated false reports as to his conduct in order to prevent him from receiving notice of the hearing or attending, such that he was found guilty and punished in absentia.  ECF 1, ¶ 71; ECF 8, ¶¶ 1, 6.  The hearing resulted in a loss of good conduct credit, as well as disciplinary segregation.  ECF 8, ¶ 3; ECF 1-1 at 35.

And, Kelly alleges that he complied with all the appropriate processes to obtain review of his sentence, "which resulted in nothing but upholding and agreeing with the RCI prison violation of plaintiff's constitutional right to procedural due process." ECF 8, ¶ 8. He identifies Sipes as the hearing officer at the disciplinary hearing (*id*. ¶ 11; *see* ECF 1-1 at 32-36 (Inmate Hearing Record)); Stotler as the warden's designee, who affirmed Sipes's decision (ECF 8, ¶ 12; *see* ECF 8-1 at 5-7 (Inmate Hearing Record)); Brown as an IGO administrative officer who "handled plaintiff's grievance" (ECF 8, ¶ 13); and Woolford as the IGO Deputy Director, who dismissed plaintiff's grievance. *Id*. ¶ 14; ECF 8-1 at 8-9 (Woolford's dismissal of Kelly's appeal).

Considering the principles reviewed above, I am satisfied that, at this juncture, Kelly has adequately stated a procedural due process claim against Sipes, the hearing officer. Plaintiff was entitled, *inter alia*, to advance written notice of the charges against him, and to a hearing at which he was afforded the right to attend, to call witnesses, and present evidence, if doing so was not inconsistent with institutional safety and correctional concerns. *See Wolff*, 418 U.S. at 564-66, 592. It is undisputed that Kelly was not permitted to attend his disciplinary hearing, and Kelly also alleges that he was not given notice of the hearing. ECF 1, ¶ 71; ECF 1-1 at 34; ECF 8, ¶¶ 1, 6. Sipes was the hearing officer who conducted the hearing. ECF 1-1 at 32-36; ECF 8, ¶ 11.

As the regulation cited in the Motion makes clear (*see* ECF 55-1 at 18-19), it was Sipes, as the hearing officer, who made the determination that plaintiff waived his appearance at the hearing based on the risk posed by his presence. *See* COMAR 12.03.01.13.B ("The *hearing officer* may determine that the defendant waived an appearance before the hearing officer and participation in the disciplinary proceeding . . . .") (emphasis added). This denial of plaintiff's ability to attend the hearing is the alleged deprivation of a constitutional right. Unlike the warden in *Wright*, 766 F.3d at 850, Sipes was "present at the adjustment team hearing" and was "involved in the conduct of

the hearing." And, like the corrections department director and the county sheriff in *Williamson*, 912 F.3d at 171, Sipes "played [a] key role[]" in the hearing.

Sipes acted based on Miller's recommendation (*see* ECF 1-1 at 30, 34), but Kelly alleges that the ground advanced by Miller was fabricated. ECF 1, ¶ 71; ECF 8, ¶¶ 1, 6. The Motion contends that Sipes acted reasonably on the basis of recommendations from Miller and Fignar that he found credible, and that there is no suggestion that he was involved in any alleged inappropriate activity by the other defendants. This argument is made primarily on the basis of Sipes's Declaration. *See* ECF 55-3. But, in my view, these are factual questions best resolved after discovery. Indeed, I note that my previous ruling denied summary judgment as to plaintiff's procedural due process claim because of genuine disputes of material fact regarding whether Kelly actually posed a threat. *See* ECF 40 at 56-57.

On the other hand, it is clear that the suit should be dismissed as to Brown. The Complaint contains only a vague allegation that she "handled plaintiff's grievance" at IGO. ECF 8, ¶ 13. But that does not amount to a claim of wrongdoing.

It is clear that Woolford, not Brown, dismissed plaintiff's grievance. The Opposition (ECF 58 at 6 n.2) makes a cursory reference to a letter from Brown to Kelly, in which Brown administratively dismissed a grievance filed by Kelly for failure to provide requested documentation. *See* ECF 8-1 at 10. The Opposition claims that this letter indicates that, "similar to Defendant Woolford, Defendant Brown denied [plaintiff's] grievance related to the infraction hearing without examining the allegations of impropriety raised by Plaintiff." ECF 58 at 6 n.2. But, this letter appears to be about an entirely different issue than the one in this case, namely a "disciplinary hearing conducted on April 3, 2019." ECF 8-1 at 10. And, it includes a case number different from that assigned to Kelly's grievance at issue in this suit. *Compare id*. *with id*. at 8.

Given the paucity of allegations as to any specific actions by Brown, I shall dismiss the suit as to Brown.

The remaining new defendants, Ronald Stotler and Robin Woolford, present more challenging questions.  Ultimately, however, I conclude that case law supports dismissal as to them.

There is no allegation that Stotler or Woolford took any action related to plaintiff, aside from confirming the result of the disciplinary hearing and denying Kelly's appeals, as the warden's designee (Stotler) or at the IGO (Woolford).  ECF 8, ¶¶ 12-13; ECF 8-1 at 5-9.  These circumstances are analogous to those in *Wright*, 766 F.3d at 850, where the Fourth Circuit found that the defendant warden did not have adequate personal involvement under § 1983 because he "was not present at the adjustment team hearing and was not involved in the conduct of the hearing. His sole involvement was to review the merits of Wright's assignment to segregation."  Likewise, Stotler and Woolford are alleged only to have reviewed the results of Kelly's disciplinary hearing on appeal.  Indeed, just as *Wright* concerned a warden, Stotler acted as the warden's "designee." ECF 8-1 at 7.  And, Woolford was even further removed in the process.

In sum, I will deny the Motion as to plaintiff's procedural due process claim against Sipes (Count II), and permit that claim to proceed.  I will otherwise dismiss the claims against the four new defendants.

### C. Maryland Tort Claims Act

The Motion urges the dismissal of the three new State law claims contained in the Second Amended Complaint, on the basis of the Maryland Tort Claims Act.  First, defendants contend that plaintiff failed to provide proper notice to the Treasurer, as required by the MTCA before filing suit.  ECF 55-1 at 19-20.  Second, the Motion asserts that the Complaint does not adequately allege

the malice or gross negligence required to overcome statutory immunity for State personnel under the MTCA.  ECF 55-1 at 20-22.

The MTCA offers "a limited waiver of sovereign immunity and 'is the sole means by which the State of Maryland may be sued in tort.'"  *Paulone v. City of Frederick*, 718 F. Supp. 2d 626, 637 (D. Md. 2010) (citation omitted); *see Condon v. Md.-Univ. of Md.*, 332 Md. 481, 492, 632 A.2d 753, 758 (1993); *Mitchell v. Housing Auth. of Balt. City*, 200 Md. App. 176, 201-202, 26 A.3d 1012, 1027-28 (2011).  It grants State personnel immunity from liability "for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence."  Md. Code (2020 Repl. Vol., 2021 Supp.), § 5-522(b) of the Courts and Judicial Proceedings Article ("C.J."); *see also* C.J. § 5-522(a)(4) ("Immunity of the State is not waived . . . for . . . Any tortious act or omission of State personnel that: (i) Is not within the scope of the public duties of the State personnel; or (ii) Is made with malice or gross negligence[.]"); S.G. § 12-105 ("State personnel shall have the immunity from liability described under § 5–522(b) of the Courts and Judicial Proceedings Article.").

Moreover, S.G. § 12-104, as in effect at the time, stated in part (italics in original):[16]

   (a) *In general.* — (1) Subject to the exclusions and limitations in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2) of this subsection.

      (2) The liability of the State and its units may not exceed $400,000 to a single claimant for injuries arising from a single incident or occurrence.

   (b) *Exclusions and limitations.* — Immunity is not waived under this section as described under § 5-522(a) of the Courts and Judicial Proceedings Article.

*See also Cooper v. Rodriguez*, 443 Md. 680, 707, 118 A.3d 829, 845 (2015).

---

[16] In 2021, the Maryland General Assembly amended S.G. § 12-104, effective July 1, 2022. *See* 2021 Md. Laws, Ch. 59. I include the text in effect at the relevant time.

"The Court of Appeals of Maryland has observed that, when read in tandem, [S.G. § 12-104 and C.J. § 5-522] establish that the tort 'liability of the State and [the tort] liability of individual State personnel are mutually exclusive. If the State is liable, the individual is immune; if the individual is liable, the State is immune.'" *Marks v. Dann*, DKC-13-0347, 2013 WL 8292331, at *7 (D. Md. July 24, 2013) (quoting *Newell v. Runnels*, 407 Md. 578, 635, 967 A.2d 729, 763 (2009)).

The "MTCA does not distinguish between constitutional torts and common law torts. Accordingly, the same standards of malice and gross negligence govern" state common law tort claims and violations of state constitutional rights. *Newell*, 407 Md. at 640 n.28, 967 A.2d at 766 n.28. Moreover, statutory immunity under the MTCA applies to both negligence and intentional torts. *See Lee v. Cline*, 384 Md. 245, 266, 863 A.2d 297, 310 (2004); *see also Espina v. Jackson*, 442 Md. 311, 325, 112 A.3d 442, 450 (2015).[17]

The MTCA imposes a notice requirement for claims brought under the statute. In general, filing a claim with the Treasurer is a "condition precedent to bringing an action under the MTCA." *Gray v. Maryland*, 228 F.Supp.2d 628, 641 (D. Md. 2002). The notice requirement is intended to "afford[ ] the State the opportunity to investigate the claims while the facts are fresh and memories vivid, and, where appropriate, settle them at the earliest possible time." *Haupt*, 340 Md. at 470, 667 A.2d at 183. But, compliance with the MTCA's notice requirement is not necessary in a suit against individual State personnel in which it is sufficiently alleged that the defendants acted with malice or gross negligence. *Barbre v. Pope*, 402 Md. 157, 181-82, 935 A.2d 699, 714 (2007); *see*

---

[17] Statutory immunity under the MTCA is distinct from Maryland's common law doctrine of public official immunity, which "is generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct." *Lee*, 384 Md. at 258, 863 A.2d at 305.

*also, e.g.*, *Taylor v. Somerset Cty. Comm'rs*, RDB-16-0336, 2016 WL 3906641, at *5 (D. Md. July 19, 2016).  Moreover, the Maryland General Assembly amended the notice requirement contained in the MTCA in 2015 and 2016, somewhat loosening its strictures.

The current statutory provision states, in part, S.G. § 12-106(b), (c) (italics in original):

(b) *Claim and denial required.* — Except as provided in subsection (c) of this section, a claimant may not institute an action under this subtitle unless:
(1) the claimant submits a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim;
(2) the Treasurer or designee denies the claim finally; and
(3) the action is filed within 3 years after the cause of action arises.

(c) *Effect of failure to submit written claim.* — (1) If a claimant fails to submit a written claim in accordance with subsection (b)(1) of this section, on motion by a claimant and for good cause shown, the court may entertain an action under this subtitle unless the State can affirmatively show that its defense has been prejudiced by the claimant's failure to submit the claim.
(2) Subsection (b)(1) and (2) of this section does not apply if, within 1 year after the injury to person or property that is the basis of the claim, the State has actual or constructive notice of:
(i) the claimant's injury; or
(ii) the defect or circumstances giving rise to the claimant's injury.

I first consider the issue of notice.[18]  It is undisputed that Kelly did not submit a written claim to the Treasurer within one year of the use of force incident on May 28, 2019, or the disciplinary hearing on May 31, 2019, which form the basis of his claims.  Instead, Kelly submitted a written claim to the Treasurer on October 5, 2020, about one month after filing this suit, and approximately four months after the one-year deadline contemplated by S.G. § 12-106(b)(1).  *See*

---

[18] As discussed, the MTCA waives the immunity of "the State and of its units." S.G. § 12-104(a)(1); *see, e.g.*, *Paulone*, 718 F. Supp. 2d at 637 (the MTCA "'is the sole means by which the State of Maryland may be sued in tort'") (citation omitted). In their notice argument, defendants contend that failure to provide notice defeats plaintiff's "claims against the State of Maryland." ECF 55-1 at 19.

ECF 55-10 (Kelly's "Notice of Claim Form," dated Oct. 5, 2020).[19]   The Motion argues that because Kelly did not submit timely notice, "none of Plaintiff's newly added claims may proceed against the State of Maryland."  ECF 55-1 at 20.

However, plaintiff has not sued the State of Maryland, nor any State agency—nor could he, consistent with the Eleventh Amendment.  *See, e.g.*, *Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 397-98 (4th Cir. 1990); *Waheed v. Maryland*, GLR-20-1931, 2021 WL 4942674, at *4 (D. Md. Oct. 22, 2021); *MediGrow, LLC v. Natalie M. LaPrade Medical Cannabis Comm'n*, 487 F. Supp. 3d 364, 373 (D. Md. 2020); *Bell v. Univ. of Md. College Park Campus Facilities Mgmt.*, PX-17-1655, 2018 WL 3008325, at *5 (D. Md. June 14, 2018); *Estate of Leysath v. Maryland*, GJH-17-1362, 2018 WL 1225087, at *4 (D. Md. Mar. 6, 2018) (all concluding that the MTCA does not waive Maryland's sovereign immunity in federal court).  Moreover, the Court has dismissed plaintiff's official capacity claims against the defendants, precisely because they are tantamount to a claim against the State.

Rather, plaintiff brings claims against individual State personnel, in their individual capacities.  This implicates C.J. § 5-522(b), governing when State personnel are liable to suit, and requires an examination of whether plaintiff has adequately alleged malice or gross negligence— an issue the parties dispute, and which I discuss, *infra*.  But, such claims do not require prior notice to the Treasurer.  *See Barbre*, 402 Md. at 181-82, 935 A.2d at 714.  Thus, the notice argument appears to be a red herring.  In any event, the parties have not addressed this issue.  Instead, they dispute notice on the merits.

---

[19] The Opposition notes that this claim was "well within" one year of the sentence that Kelly received at the disciplinary hearing. ECF 58 at 8.

Although the Motion includes the text of S.G. § 12-106(b), it omits the exceptions to the notice requirement contained in S.G. § 12-106(c).  *See* ECF 55-1 at 19.  Indeed, the statutory citation included in the Motion cites to the 2011 version of S.G. § 12-106, which precedes the addition of S.G. § 12-106(c).  *See id.* at 19 (quoting "Md. Code Ann., State Gov't, § 12-106(b) (*2011*)") (emphasis added).  And, the statutory exceptions provide the basis for the Opposition's argument.  *See* ECF 58 at 9.

Plaintiff contends that defendants have advanced no argument as to any prejudice from his delayed notice.  And, given the plethora of grievances and appeals filed by Kelly in relation to the incidents at issue, the Motion maintains that, within one year of the events, the State had ample "actual or constructive notice" of "the claimant's injury," or "the defect or circumstances giving rise to the claimant's injury."  S.G. § 12-106(c)(2).  Defendants offer no response to these arguments in the Reply.  ECF 59 at 1.

In the Motion, defendants seem to argue that the State was not on constructive notice of the injury within one year because plaintiff did not file suit until September 2020, about three months after the one-year deadline.  ECF 55-1 at 20.  But, nothing in the text of S.G. § 12-106(c)(2) suggests that "actual or constructive notice" arises only from the filing of a lawsuit.

I am persuaded by plaintiff's arguments, to which defendants offer no meaningful response.  In particular, soon after the events in issue, Kelly submitted various complaints, grievances, or appeals to prison and DPSCS officials regarding the use of force incident and subsequent disciplinary proceedings.  *See, e.g.*, ECF 1-1 at 45-54 (ARP related to incident, dated July 9, 2019); *id.* at 42-44 (appeal of ARP response to Commissioner of Correction, dated July 22, 2019); *id.* at 82-85 (letter to Audrey Brown at IGO related to incident, dated June 14, 2019); *id.* at 92-93 (NCBI "Inmate Request" for information related to incident, dated June 19, 2019); ECF 8-

1 at 8-9 (Woolford decision of Feb. 18, 2020, referring to communications from plaintiff to IGO related to incident between June and August 2019). Therefore, within one year of the alleged injury, "the State ha[d] actual or constructive notice" of Kelly's injury, or at the very least the "defect or circumstances giving rise" to his injury. S.G. § 12-106(c)(2). And, this is all that is required under this statutory provision to excuse Kelly from the notice requirement.

In addition, the notices are pled or included in the Complaint. *See, e.g.*, ECF 1, ¶ 78; ECF 8, ¶ 8. And, the State was plainly aware of the circumstances of the incident, because it responded to many of plaintiff's grievances. *See, e.g.*, ECF 8-1 at 8-9. And, it also subjected Kelly to both institutional disciplinary proceedings and criminal prosecution in connection with the incident of May 28, 2019.

Moreover, it appears that plaintiff has a strong argument for "good cause" for his belated Treasurer notice, given the circumstances of his incarceration, segregation, and prosecution. S.G. § 12-106(c)(1). And, defendants have not even attempted to mount an "affirmative[]" showing of prejudice from the filing of the claim with the Treasurer four months late. Nor can I discern any prejudice, given Kelly's numerous other complaints and the State's conduct in the intervening period. *Id*.

I turn next to the argument that the Complaint does not adequately allege malice or gross negligence on the part of defendants, meaning that there is no waiver of defendants' statutory immunity as State personnel. *See* ECF 55-1 at 20-22. As noted, C.J. § 5-522(b) grants State personnel immunity from liability "for a tortious act or omission that is within the scope of the public duties of the State personnel *and is made without malice or gross negligence*." (Emphasis added.)

For purposes of MTCA immunity, "malice" refers to so-called "actual malice," *i.e.*, "conduct 'characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Lee*, 384 Md. at 268, 863 A.2d 297, 863 A.3d at 311 (citation omitted). "To establish malice, a plaintiff must show that the government official 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Nero v. Mosby*, 890 F.3d 106, 127 (4th Cir. 2018) (quoting *Bord v. Baltimore Cty.*, 220 Md. App. 529, 557, 104 A.3d 948, 964 (2014)).

Gross negligence means "'an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.'" *Newell*, 407 Md. at 638, 967 A.2d at 764 (citation and internal footnote omitted); *see also Cooper*, 443 Md. at 686, 118 A.3d at 832-33. Put another way, gross negligence is found when a State employee is so "'utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *Newell*, 407 Md. at 638, 967 A.2d at 764-65 (citation omitted).

"[S]tate personnel are not immune from suit and liability in tort when the plaintiff's complaint *sufficiently* alleges malice or gross negligence." *Barbre*, 402 Md. at 181-82, 935 A.2d at 714 (emphasis in original). The Maryland Court of Appeals "has recognized consistently that the determination of whether a State actor enjoys State personnel immunity is a question for the trier of fact." *Newell*, 407 Md. at 636, 976 A.2d at 763; *see Cooper*, 443 Md. at 709, 118 A.3d at 846 (stating that determination of whether the actions of a defendant constitute gross negligence is ordinarily left to the trier of fact); *Taylor v. Harford Cty. Dep't of Social Servs.*, 384 Md. 213, 229, 862 A.2d 1026, 1034 (2004) ("Ordinarily, unless the facts are so clear as to permit a

conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence.") (citation and internal quotation marks omitted); *Romanesk v. Rose*, 248 Md. 420, 423, 237 A.2d 12, 14 (1968) ("Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case" and "is usually a question for the jury and is a question of law only when reasonable [people] could not differ as to the rational conclusion to be reached.") (citations omitted).  Still, at the motion to dismiss stage, "'the plaintiff must allege with some clarity and precision those facts which make the act malicious.'" *Manders v. Brown*, 101 Md. App. 191, 216, 643 A.2d 931, 943 (1994) (quoting *Elliot v. Kupferman*, 58 Md. App. 510, 526, 473 A.2d 960, 969 (1984)).

Because I have dismissed the State law claims against Sipes, Stotler, Brown, and Woolford, I need only analyze whether the Complaint sufficiently alleges malice or gross negligence as to Miller, Davis, Walley, Cornell, and Fignar.  I have little difficulty in concluding that, at the Rule 12(b)(6) stage, it does so.  The Second Amended Complaint specifically alleges that, in their use of force against Kelly, defendants acted with "ill will, recklessness, wantonness, and/or in the reckless and willful disregard for the welfare and rights of Mr. Kelly . . . with actual malice and intent to harm" him.  ECF 53, ¶ 24.  By itself, this assertion would be conclusory.  But, the facts alleged in the Complaint readily constitute malice or, at the very least, gross negligence, under the definitions discussed above.[20]  Davis, Walley, Cornell, and Fignar are accused of participating in the brutal, deliberate, and unprovoked use of violence against Kelly, and thereafter covering up the circumstances.  *See* ECF 1, ¶¶ 51-60.  For his part, Miller is alleged to have deliberately falsified his recommendation regarding Kelly at Fignar's behest, to prevent him from attending his

---

[20] Plaintiff concedes that he has "inartfully" captioned Count IV as "Negligence." ECF 53 at 5. But, I agree with him that I must look not to the label but to the actual facts alleged to determine whether he has sufficiently alleged malice or gross negligence.

disciplinary hearing as he was entitled to do, and to avoid revealing the extent of his injuries.  ECF 1, ¶ 71; ECF 8, ¶¶ 1, 6.[21]

Therefore, plaintiff's State law claims against Miller, Davis, Walley, Cornell, and Fignar may proceed.  And, as mentioned, because plaintiff has sufficiently alleged malice or gross negligence, the notice requirements of the MTCA do not apply.  *See Barbre*, 402 Md. at 181-82, 935 A.2d at 714.

### IV.  Conclusion

For the reasons stated above, I shall construe the Motion as a motion to dismiss, and grant it in part and deny it in part.  In particular, I shall dismiss plaintiff's official capacity claims.  And, I shall dismiss all claims against defendants Ronald Stotler, Audrey Brown, and Robin Woolford. As to defendant David Sipes, I shall dismiss all claims, except for the Fourteenth Amendment procedural due process claim in Count II.

Moreover, except as to the official capacity claims, dismissal shall be without prejudice, as plaintiff could, in theory, remedy the defects in the Complaint through new factual allegations.  In the Opposition, plaintiff includes a cursory request for leave to further amend the Complaint regarding his procedural due process claims as to the new defendants.  *See* ECF 58 at 7 n.3. However, this case was originally filed in September 2020.  And, it has been approximately a year since my decision of July 19, 2021, ruling that plaintiff has advanced certain viable claims.  *See* ECF 40; ECF 41.

---

[21] I note that in my ruling of July 19, 2021, I denied summary judgment as to these issues. *See* ECF 40 at 43-46, 56-57.

Furthermore, plaintiff's counsel had the opportunity to file a Second Amended Complaint. *See* ECF 53.  And, it is unclear what new facts plaintiff could allege, at least at this stage, that would address the issues as to the procedural due process claims that are subject to dismissal.

If I were to grant plaintiff leave to amend the Complaint for the third time, it seems likely that a motion to dismiss would follow, given the history of this case.  In this 2020 case, I am unwilling to further delay the start of discovery.  *See, e.g.*, *Boardley v. Household Finance Corp. III*, PWG-12-3009, 2015 WL 3486891, at *3 (D. Md. June 1, 2015) (discussing the perils of successively granting leave to amend, preventing a case from progressing).

However, as dismissal is without prejudice, plaintiff may move to amend at a later time, if warranted by relevant facts uncovered in discovery.  I express no opinion as to how the Court would rule on such a motion.

An Order follows, consistent with this Memorandum Opinion.


Date:   July 12, 2022                                       _____/s/_____

                                                            Ellen L. Hollander
                                                            United States District Judge